[No. D058753. Fourth Dist., Div. One. Oct. 4, 2012.]

DARREN D. CHAKER, Plaintiff and Appellant, v.
WENDY MATEO, Defendant and Respondent.

COUNSEL

Mataele Law Office and Isileli Tupou Manaia Mataele for Plaintiff and Appellant.

The McMillan Law Firm and Scott A. McMillan for Defendant and Respondent.

OPINION

BENKE, Acting P. J.—In this anti-SLAPP law[1] case, the trial court determined plaintiff's complaint, which alleges a single defamation cause of action, arises from defendant's exercise of her constitutional right of free speech and that plaintiff failed to establish a probability he would prevail on those claims. We agree with the trial court that plaintiff's claims arise from the exercise of defendant's right of free speech. We also agree that plaintiff failed to establish a probability of success on the merits of his defamation claim. Thus, the trial court did not err in granting defendant's motion to strike plaintiff's complaint.

## FACTUAL AND PROCEDURAL BACKGROUND

The record[2] indicates plaintiff and appellant Darren D. Chaker had a brief romantic relationship with Nicole Mateo (Nicole), who resides in Texas. During the relationship, Nicole became pregnant and delivered Chaker's child. The record also indicates that following the birth of the child, Chaker and Nicole engaged in a contentious paternity and child support dispute in the Texas courts.

---

[1] Code of Civil Procedure section 425.16 sets forth the California Anti-SLAPP Law (Anti-SLAPP Law). (See Code Civ. Proc., § 425.17, subd. (a).)

[2] We deny plaintiff's request for judicial notice. The records he asks us to notice were not presented in the trial court. (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2 [112 Cal.Rptr.3d 853, 235 P.3d 152].)

In 2010 a series of derogatory statements about Chaker, and his forensics business, appeared on an Internet Web site where members of the public may comment on the reliability and honesty of various providers of goods and services and on another social networking Web site which provided an open forum for members of the public to comment on a variety of subjects. The following are statements which refer to Chaker and appeared on one of the sites: "You should be scared. This guy is a criminal and a deadbeat dad. As you can see, I am the child's grandma so I know. If you should eve [sic] come across this person, be very careful. He may be taking steroids so who knows what could happen." "I would be very careful dealing with this guy. He uses people, is into illegal activities, etc. I wouldn't let him into my house if I wanted to keep my possessions or my sanity." Chaker attributes both of these statements, as well as others which accuse him of fraud, deceit and picking up streetwalkers and homeless drug addicts, to defendant and respondent Wendy Mateo (Wendy), Nicole's mother and the grandmother of his child. The Internet Web sites contained other derogatory statements apparently posted by other defendants, including Nicole.

On June 22, 2010, Chaker filed a complaint against Wendy and Nicole, among others. As we indicated, Chaker's complaint alleges a single cause for defamation based on the statements which appeared on the Internet Web sites.

Wendy appeared in the action and moved to strike the complaint under the Anti-SLAPP Law. (Code Civ. Proc.,[3] § 425.16.) Among other matters, Wendy argued that Chaker has been previously determined to be a vexatious litigant. Wendy also submitted excerpts from a number of Web sites on which Wendy asserted Chaker had made derogatory statements about Nicole and Nicole's attorney. The trial court granted her motion and, as to her, struck the complaint. Chaker filed a timely notice of appeal.

I

**(1)** "[S]ection 425.16[4] requires the trial court to undertake a two-step process in determining whether to grant a SLAPP motion. 'First, the court

---

[3] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

[4] "The Legislature enacted section 425.16 in 1992 to provide a procedure by which a trial court can 'dismiss at an early stage nonmeritorious litigation meant to chill the valid exercise of the constitutional rights of freedom of speech and petition in connection with a public issue.' [Citation.] The statute, as subsequently amended, provides in part:

" '(a) The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly.

decides whether the defendant has made a threshold prima facie showing that the defendant's acts, of which the plaintiff complains, were ones taken in furtherance of the defendant's constitutional rights of petition or free speech in connection with a public issue.' [Citation.]

"If the court finds the defendant has made the requisite showing, the burden then shifts to the plaintiff to establish a 'probability' of prevailing on the claim by making a prima facie showing of facts that would, if proved, support a judgment in the plaintiff's favor. [Citation.] The court also considers the defendant's opposing evidence, but only to determine if it defeats the plaintiff's showing as a matter of law. [Citation.] That is, the court does not weigh the evidence or make credibility determinations. [Citations.] Finally, in assessing the probability the plaintiff will prevail, the court considers only the evidence that would be admissible at trial. [Citations.]

"Whether section 425.16 applies, and whether the plaintiff has shown a probability of prevailing, are both questions we review independently on appeal. [Citation.]" (*Kashian v. Harriman, supra,* 98 Cal.App.4th at p. 906.)

## II

Initially, Chaker claims that because Wendy allegedly posted her statements on Internet Web sites and they were about matters which concerned his dispute with her daughter, they were not statements which implicated her right of free speech. Like the trial court, we reject this contention.

The leading case with respect to Internet postings on consumer-oriented Web sites, such as the ones where Wendy allegedly posted her statements, is

---

" '(b)(1) *A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.*

" '(2) In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based. [¶] . . . [¶]

" '(e) As used in this section, "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue" includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.' (Italics added.)" (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 905–906 [120 Cal.Rptr.2d 576].)

*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 900 [17 Cal.Rptr.3d 497] (*Wilbanks*). In *Wilbanks* the plaintiff was an insurance broker who specialized in viaticals, an arrangement by which a viatical firm purchases life insurance policies from individuals who are near death. The defendant in *Wilbanks*, Wolk, was a former insurance agent who, acting as a "consumer watchdog," established her own Web site which provided the public information about viaticals and the insurance brokers who provide them. Wolk posted a statement highly critical of the plaintiff's business practices and reported the plaintiff was under investigation by California's Department of Insurance. On appeal from an order striking the plaintiff's defamation complaint, the court found that the Web site statements were made in a public forum and were of public interest.

In finding that the Internet was a public forum, the court stated: "In our view, whether a statement is 'made in a place open to the public or in a public forum' depends on whether the means of communicating the statement permits open debate. We agree that Wolk's Web site—and most newspapers—are not public forums in and of themselves. It does not follow, however, that statements made on a Web site or in a newspaper are not made in a public forum. Where the newspaper is but one source of information on an issue, and other sources are easily accessible to interested persons, the newspaper is but one source of information in a larger public forum.

"In a sense, the Web, as a whole, can be analogized to a public bulletin board. A public bulletin board does not lose its character as a public forum simply because each statement posted there expresses only the views of the person writing that statement. It is public because it posts statements that can be read by anyone who is interested, and because others who choose to do so, can post a message through the same medium that interested persons can read. Here, while Wolk controls her Web site, she does not control the Web. Others can create their own Web sites or publish letters or articles through the same medium, making their information and beliefs accessible to anyone interested in the topics discussed in Wolk's Web site.

"We conclude, therefore, that Wolk's statements were made in a public forum." (*Wilbanks, supra,* 121 Cal.App.4th at pp. 896–897.)

In finding Wolk's statements were in the public interest, the court stated: "That the information provided here is in the nature of consumer protection information distinguishes this case from others recognizing that a publication does not become connected with an issue in the public interest simply because it is widely disseminated, or because it can be used as an example of bad practices or of how to combat bad practices. The statements made by Wolk were not simply a report of one broker's business practices, of interest

only to that broker and to those who had been affected by those practices. Wolk's statements were a warning not to use plaintiffs' services. In the context of information ostensibly provided to aid consumers choosing among brokers, the statements, therefore, were directly connected to an issue of public concern." (*Wilbanks, supra*, 121 Cal.App.4th at p. 900, fns. omitted.)

More recently, cases which have considered the public interest requirement of the Anti-SLAPP Law have emphasized that the public interest may extend to statements about conduct between private individuals. (See *Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 467 [137 Cal.Rptr.3d 455] (*Hecimovich*); *Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1538–1539, 1547 [33 Cal.Rptr.3d 145] (*Terry*).) In finding a public interest within the meaning of the statute in statements criticizing a volunteer basketball coach's treatment of his players, the court in *Hecimovich* noted: "Like the SLAPP statute itself, the question whether something is an issue of public interest must be ' " 'construed broadly.' " ' [Citations.] An ' " 'issue of public interest' " ' is ' "*any issue in which the public is interested.*" ' [Citation.] A matter of ' " 'public interest should be something of concern to a substantial number of people. [Citation.] . . . [T]here should be some degree of closeness between the challenged statements and the asserted public interest [citation] . . . .' '[T]he focus of the speaker's conduct should be the public interest . . . .' " [Citation.] Nevertheless, it may encompass activity between private people.' [Citation.]

"We look for 'the *principal thrust* or *gravamen* of the plaintiff's cause of action.' [Citation.] We 'do not evaluate the first prong of the anti-SLAPP test solely through the lens of a plaintiff's cause of action.' [Citation.] The 'critical consideration' is what the cause of action is '*based on.*' [Citation.]" (*Hecimovich, supra*, 203 Cal.App.4th at pp. 464–465.)

In concluding statements about the coach's style were a matter of public interest to the parents of players, the court stated: "[I]t would appear that plaintiff essentially agrees that the suitability of his coaching style was a matter of public interest among the parents. As plaintiff testified, he himself urged the team parents to join in an investigation of his suitability to coach the young players because it involved 'the well being of our kids.' In his words: 'Please, if you would, take the time to answer [Perri's] questions fully and truthfully, and don't hold anything back on the grounds that it might be hurtful to me. I think that if the PTO wants to ensure the well being of our kids (at least in this one, highly-selective occasion) everyone should be forthcoming.' [¶] . . . [¶]

"In sum, we conclude that safety in youth sports, not to mention problem coaches/problem parents in youth sports, is another issue of public interest within the SLAPP law. [Citations.]" (*Hecimovich, supra,* 203 Cal.App.4th at pp. 467–468.)

In *Terry,* which the court in *Hecimovich* relied upon, the plaintiffs, church youth group leaders, were accused by the defendants of having an inappropriate sexual relationship with a minor female member of the youth group. In rejecting the plaintiffs' contention their relationship with the minor was solely a private matter, the court stated: "Plaintiffs characterize the issue in this case as a private relationship between George Terry and the girl. Not so. The issue as to whether or not an adult who interacts with minors in a church youth program has engaged in an inappropriate relationship with any of the minors is clearly a matter of public interest. The public interest is society's interest in protecting minors from predators, particularly in places such as church programs that are supposed to be safe. It need not be proved that a particular adult is in actuality a sexual predator in order for the matter to be a legitimate subject of discussion." (*Terry, supra,* 131 Cal.App.4th at p. 1547.)

In light of the principles and holdings in *Wilbanks, Hecimovich* and *Terry,* we have little difficulty concluding Wendy's statements were made in a public forum. Like the court in *Wilbanks,* we view the Internet as an electronic bulletin board open to literally billions of people all over the world. (See *Wilbanks, supra,* 121 Cal.App.4th at p. 897.) The Internet is a classic public forum which permits an exchange of views in public about everything from the great issues of war, peace, and economic development to the relative quality of the chicken pot pies served at competing family restaurants in a single small neighborhood.

We also have little difficulty finding the statements were of public interest. The statements posted to the Ripoff Report Web site about Chaker's character and business practices plainly fall within the rubric of consumer information about Chaker's "Counterforensics" business and were intended to serve as a warning to consumers about his trustworthiness. The remaining statements were posted to the "topix" Web site, which identified itself as a social networking site ("Join the Topix Community") and permitted users to create their own profile and post information on its forum. These statements also fall within the broad parameters of public interest within the meaning of section 425.16. Of particular significance is the fact that it appears from the record Chaker became the subject of statements on the "topix" Web site only after he posted a profile on the Web site and it generated responses from other members of the community, including apparently statements from Wendy. Having elected to join the topix Web site, Chaker clearly must have recognized that other participants in the Web site would have a legitimate interest

in knowing about his character before engaging him on the Web site. Thus, here Chaker himself made his character a matter of public interest as the term has been interpreted.

Because the record shows the statements which give rise to Chaker's defamation claim were made in a public forum with respect to a matter of public interest within the meaning of section 425.16, subdivision (e)(3), Chaker bore the burden of showing a probability of prevailing on his defamation claim. (§ 425.16, subd. (b)(1).)

## III

■ " 'We decide the second step of the anti-SLAPP analysis on consideration of "the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." [Citation.] Looking at those affidavits, "[w]e do not weigh credibility, nor do we evaluate the weight of the evidence. Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law." [Citation.] That is the setting in which we determine whether plaintiff has met the required showing, a showing that is "not high." [Citation.] In the words of the Supreme Court, plaintiff needs to show only a "minimum level of legal sufficiency and triability." [Citation.] In the words of other courts, plaintiff needs to show only a case of "minimal merit." [Citations.]'

"While plaintiff's burden may not be 'high,' he must demonstrate that his claim is legally sufficient. [Citation.] And he must show that it is supported by a sufficient prima facie showing, one made with 'competent and admissible evidence.' [Citations.]" (*Hecimovich, supra*, 203 Cal.App.4th at pp. 468–469.)

■ Here, the principle question we face is whether Mateo's statements may be considered statements of fact or opinion. In doing so, we must recognize "[t]he critical determination of whether the allegedly defamatory statement constitutes fact or opinion *is a question of law.* [Citations.]" (*Gregory v. McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 601 [131 Cal.Rptr. 641, 552 P.2d 425], italics added.) In determining whether an opinion is actionable, we must look at the totality of the circumstances which gave rise to the statements and in particular the context in which the statements were made. (*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 389 [10 Cal.Rptr.3d 429].) " 'This contextual analysis demands that the courts look at the nature and full content of the . . . audience to whom the publication was directed.' " (*Ibid.*)

In determining statements are nonactionable opinions, a number of recent cases have relied heavily on the fact that statements were made in Internet forums. (See, e.g., *Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 696–701 [142 Cal.Rptr.3d 40] *(Summit Bank)*; *Krinsky v. Doe 6* (2008) 159 Cal.App.4th 1154, 1162 [72 Cal.Rptr.3d 231] *(Krinsky)*; *Global Telemedia Internat., Inc. v. John Doe I* (C.D.Cal. 2001) 132 F.Supp.2d 1261, 1267; Lidsky, *Silencing John Doe: Defamation & Discourse in Cyberspace* (2000) 49 Duke L.J. 855, 936–937; Comment, *Cybersmear or Cyber-SLAPP: Analyzing Defamation Suits Against Online John Does as Strategic Lawsuits Against Public Participation* (2001) 25 Seattle U. L.Rev. 213, 217 ["Posters on Yahoo! message boards often make outrageous claims . . ." and "[m]ost visitors are completely aware of the unreliable nature of these posts . . . ."].) With respect to statements posted in a section of the craigslist Web site entitled "rants and raves," the court in *Summit Bank* found that a reader "should be predisposed to view them with a certain amount of skepticism, and with an understanding that they will likely present one-sided viewpoints rather than assertions of provable facts. '[A]ny reader familiar with the culture of . . . most electronic bulletin boards . . . would know that board culture encourages discussion participants to play fast and loose with facts. . . . Indeed, the very fact that most of the posters remain anonymous, or pseudonymous, is a cue to discount their statements accordingly.' [Citations.]" *(Summit Bank, supra,* 206 Cal.App.4th at pp. 696–697.)

In *Summit Bank,* the defendant posted a series of derogatory statements about the plaintiff bank: "(1) The Bank didn't pay dividends in 2009; (2) the 'bitch CEO' who runs the Bank 'thinks that the Bank is her personel [*sic*] Bank to do with as she pleases'; (3) the CEO should not be allowed to provide an executive position to her 'worthless, lazy fat ass son'; (4) depositors should move their accounts immediately, 'before its [*sic*] too late'; (5) the Bank is 'screwed up,' 'piss poor,' and a 'problem Bank'; (6) the Federal Deposit Insurance Corporation (FDIC) and California's Department of Financial Institutions have 'look[ed] at Summit Bank' three times in less than one year and that is 'not a good thing'; (7) service was poor at the Bank's Hayward branch and the Bank closed it; (8) after the Hayward branch was closed, the customers 'were left high and dry'; and (9) the Bank's depositors should leave 'before they close.' " *(Summit Bank, supra,* 206 Cal.App.4th at p. 697.)

The plaintiff bank in *Summit Bank* alleged the statements taken together, and in particular the statement the CEO used the bank as her personal bank and the plaintiff was a "problem bank," suggested the CEO was misappropriating money and the bank was on the verge of insolvency. In finding the defendant's statements were nonactionable opinions, the court relied in part on the fact they were posted on the Internet craigslist "rants and raves" Web

site and lacked " 'the formality and polish typically found in documents in which a reader would expect to find facts.' " (*Summit Bank, supra*, 206 Cal.App.4th at p. 699.)

In *Krinsky* the court found the following statements, made on an Internet blog, were hyperbolic opinions: " '[F]unny and rather sad that the losers who post here are supporting a management consisting of boobs, losers and crooks. (Krinsky, Natan and Seifer) while criticizing a charitable and successful hedge fund manager, who, unlike his critics and the longs here, has done his homework. [¶] How many of the idiot longs here did their work and said to themselves, "I know Natan had been CFO of at least 3 bankrupt companies and I know Seifer filed for personal bankruptcy and roughed up some patients, shares a rolls royce and a bently [*sic*] with the President and a $15mm [*sic*] mansion, but what the hey, the numbers look good and it has been a long time." [¶] No, Loeb earned his $$$ and those of you who are whimpering on eachother's [*sic*] shoulders crying to be saved by Spizer, the SEC etc are a bunch of pathetic losers . . . . But we already knew that, you were long SFCC. [¶] Ole!' " (*Krinsky, supra*, 159 Cal.App.4th at p. 1176.) Like the court in *Summit Bank*, the court in *Krinsky* relied in large part on the fact the statements were made on an Internet message board where heated discussions about the plaintiff were taking place. (*Id.* at pp. 1175, 1177–1178.)

This brings us to the question of law which, under *Gregory v. McDonnell Douglas Corp., supra*, 17 Cal.3d at page 601 we are required to resolve: were the statements which Mateo allegedly made statements of provable fact or mere opinions? As we have noted, the statements about Chaker were made in the context of the paternity and child support litigation going on between Chaker and Wendy's daughter and all were made on Internet Web sites which plainly invited the sort of exaggerated and insulting criticisms of businesses and individuals which occurred here. The overall thrust of the comments attributed is that Chaker is a dishonest and scary person. This overall appraisal of Chaker is on its face nothing more than a negative, but nonactionable opinion.

In this context it is difficult to conclude Mateo's alleged embellishments, to the effect Chaker picks up streetwalkers and homeless drug addicts and is a deadbeat dad, would be interpreted by the average Internet reader as anything more than the insulting name calling—in the vein of "she hires worthless relatives," "he roughed up patients" or "he's a crook"—which one would expect from someone who had an unpleasant personal or business experience with Chaker and was angry with him rather than as any provable statement of fact. In this regard, we note the insults are generalized in that they lack any specificity as to the time or place of Chaker's supposed behavior; the absence

of such specificity is yet a further signal to the reader there is no factual basis for the accusations. Thus, we are unable to distinguish these insults from the nonactionable ones posted in *Summit Bank* and *Krinsky*, and like the courts in those cases, we conclude these statements are nonactionable opinions.

The only statement which might arguably fall outside the scope of nonactionable opinion or epithet is the statement Mateo is a criminal. However, that statement is true. As the trial court noted, the fact Chaker's conviction was later expunged did not prevent others from making true statements about his criminal history.

In sum, Chaker did not meet the minimal burden required to show he was likely to prevail on his defamation claim, as required by the second step of analysis under the Anti-SLAPP Law. Accordingly, we must affirm the order striking his complaint.

## DISPOSITION

The order striking Chaker's complaint is affirmed. Mateo to recover her costs of appeal.

O'Rourke, J., and Irion, J., concurred.