Filed 7/30/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| BENTLY RESERVE L.P. et al.,<br><br>　　　Plaintiffs and Respondents,<br><br>v.<br><br>ANDREAS G. PAPALIOLIOS,<br><br>　　　Defendant and Appellant. | A136191<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-12-519571) |

Defendant Andreas Papaliolios (Papaliolios) appeals from an order denying his special motion to strike a libel claim under Code of Civil Procedure section 425.16[1] (the "anti-SLAPP" statute). The claim arises from a negative review of an apartment building Papaliolios posted to Yelp, an Internet Web site. Papaliolios asserts his review is mere opinion or, alternatively, substantially true and, therefore, non-libelous. While many Internet critiques are nothing more than ranting opinions that cannot be taken seriously, Internet commentary does not ipso facto get a free pass under defamation law. Papaliolios's review, in part, is susceptible to being read as containing factual assertions, not just mere opinion, and plaintiffs submitted sufficient evidence to meet their minimal burden under the anti-SLAPP statute to show a probability of prevailing on at least some aspect of their libel claim. We therefore affirm the order denying Papaliolios's special motion to strike.

---

[1] All further statutory references are to the Code of Civil Procedure unless indicated.

1

## FACTUAL AND PROCEDURAL BACKGROUND

Bently Nob Hill, L.P., has owned the apartment building at 1360 Jones Street (the Jones Building) since March 2005. Christopher Bently (Bently) is an owner and managing partner of the limited partnership. Amber Marie Bently is Christopher's wife. Bently and his wife later took up residence in the Jones Building penthouse, unit 1001.

Papaliolios moved into the Jones Building in 2004. After three years of contentious and litigious relations with his new landlord-come-cotenant, Papaliolios left in early 2008.

Four years later, between late February and early March 2012, Papaliolios, employing the user name "Sal R.," posted a review of the Jones Building on Yelp, a Web site that collects consumer reviews of businesses. The review, which appeared on a Yelp page devoted to the Jones Building, read:

> "Sadly, the Building is (newly) owned and occupied by a sociopathic narcissist— who celebrates making the lives of tenants hell. Of the 16 mostly-long-term tenants who lived in the Building when the new owners moved in, the new owners' noise, intrusions, and other abhorrent behaviors (likely) contributed to the death of three tenants (Pat, Mary, & John), and the departure of eight more (units 1001, 902, 802, 801, 702, 701, 602, 502) in very short order. Notice how they cleared-out all the upper-floor units, so they could charge higher rents?

> "They have sought evictions of 6 of those long-term tenants, even though rent was paid-in-full, and those tenants bothered nobody. And what they did to evict the occupants of unit #902, who put many of tens of thousands of dollars into their unit, was horrific and shameful.

> "This is my own first-hand experience with this building, and its owners. I know this situation well, as I had the misfortune of being in a relationship with one of the Building's residents at the time, have spent many days and nights over many years in the Building, and have personally witnessed the abhorrent behavior of the owners of the Building.

> "There is NO RENT that is low enough to make residency here worthwhile."

Papaliolios posted substantially the same review several times.[2] Each time, Bently complained to Yelp and asked Yelp to remove the review. Each time, Yelp complied. One version of the review, however, remained on Yelp's forum related to complaints about how Yelp handles removal of reviews from its Web site.

On March 28, 2012, based on the posting quoted above, Bently, his wife, and Bently Nob Hill (collectively, plaintiffs) sued Papaliolios for libel.[3]

Two months later, on May 25, 2012, Papaliolios responded with a special motion to strike under section 425.16. Papaliolios claimed the libel cause of action was aimed at suppressing his right to speak in an open forum about an issue of public interest, and further claimed plaintiffs would be unable to show a probability of prevailing on their libel claim because the statements in the review were mere opinions and thus not provably false.

Plaintiffs opposed the motion, asserting numerous statements in the review were indeed provably false and offering evidence of that. For instance, plaintiffs juxtaposed these statements with evidence they submitted:

| Statement | Evidence |
|---|---|
| "the Building is (newly) owned and occupied by a sociopathic narcissist" | Bently's declaration that there is no such medical diagnosis for Bently or his wife. |
| "the new owners' noise, intrusions, and other abhorrent behaviors (likely) contributed to the death of three tenants (Pat, Mary, & John)" | Declarations of relatives and a city death certificate showing Mary and John are alive, while Pat died in 2008 of pneumonia and cancer. |

[2] At least one version of the review substituted the word "resulted" for the word "contributed," so the middle sentence of the first paragraph read: ". . . the new owners' noise, intrusions, and other abhorrent behaviors (likely) resulted in the death of three tenants (Pat, Mary, & John), and the departure of eight more (units 1001, 902, 802, 801, 702, 701, 602, 502) in very short order."

[3] The complaint also contains a cause of action for trespass brought by another entity, Bently Reserve, L.P., against Papaliolios. That claim is not at issue in this appeal.

3

| | |
|---|---|
| "the new owners' noise, intrusions, and other abhorrent behaviors (likely) contributed to . . . the departure of eight more [of the 16 mostly-long-term tenants who lived in the Building when the new owners moved in] (units 1001, 902, 802, 801, 702, 701, 602, 502) in very short order" | Bently's declaration that exit interviews did not reveal tenants leaving for these reasons; the tenants in 801 and 802 continue to reside in their apartments; the tenants in 1001 agreed to move to unit 702 in 2005 when Bently and his wife expressed interest in residing in unit 1001, then those tenants vacated 702 in 2006 to move to the East Coast; tenants in 902 stayed until 2009; tenants in 602 and 502 stayed until 2007; and Papaliolios rented 701 and stayed until 2008. |
| "They have sought evictions of 6 of those long-term tenants, even though rent was paid-in-full, and those tenants bothered nobody" | Bently's declaration that plaintiffs did not seek to evict any tenant except Papaliolios, and that proceeding did not result in his eviction (left on his own). |
| "they . . . evict[ed] the occupants of unit #902" | Bently's declaration that there was no eviction of the occupants of unit 902. |
| "they cleared-out all the upper-floor units, so they could charge higher rents" | Bently's declaration that of the tenants on floors 8, 9, and 10, only the tenants of 902 vacated after an attempt to raise rent. |

In conjunction with his reply memorandum, Papaliolios submitted evidence he claimed undermined plaintiffs' showing as to how the Jones Building tenants departed. He contended, based on a copy of a Notice to Terminate Tenancy served in April 2005, that the four former tenants of unit 1001 were, in fact, evicted to make room for Bently and his wife. He provided a copy of a notice, ultimately filed with the San Francisco Rent Stabilization and Arbitration Board, from Bently Nob Hill's attorney to the two tenants of unit 402, demanding they remove a rug and chair from the foyer outside their apartment or vacate within three days. He pointed to hearsay statements of another tenant suggesting the tenants in 902 were forced out after Bently repeatedly hailed them before the San Francisco Rent Control Board, assertedly to reap the benefits of $60,000 in renovations the tenants had made. He pointed to an admission by Bently Nob Hill, in

4

answering the complaint in another of the parties' lawsuits, that "in August 2005 [five months after acquiring the Jones Building], unit 802 became available for rent," an admission confirmed by the declaration of the current tenant of 802 who took possession in September 2005. Finally, as to unit 602, Papaliolios attached a printout from the San Francisco Rent Board showing a landlord petition filed on March 20, 2006, against that unit's tenants (for unknown reasons, and with an unknown result).

The trial court heard and denied the anti-SLAPP motion on July 17, 2012. The court concluded that, while the libel claim fell within the ambit of the anti-SLAPP statute, plaintiffs had "provid[ed] evidence showing" the "requisite minimal merit" of their claim and thus had carried their burden under the statute.

**DISCUSSION**

Resolving the merits of an anti-SLAPP motion under section 425.16 is ordinarily "a two-part analysis, concentrating initially on whether the challenged cause of action arises from protected activity within the meaning of the statute and, if it does, proceeding secondly to whether the plaintiff can establish a probability of prevailing on the merits." (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 699 [61 Cal.Rptr.3d 29] (*Overstock.com*).) In this case, "we bypass the initial inquiry because everyone agrees that the first hurdle in obtaining anti-SLAPP relief has been met," (*ibid.*) and, indeed, the libel claim undoubtedly arises from protected activity. We therefore focus solely on the second prong—whether plaintiffs carried their burden of showing a probability of prevailing on the merits of their libel claim. (*Ibid.*)

In this regard, our review is de novo. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325–326 [46 Cal.Rptr.3d 606, 139 P.3d 2]; *Tutor-Saliba Corp. v. Herrera* (2006) 136 Cal.App.4th 604, 609 [39 Cal.Rptr.3d 21].) We apply a "summary-judgment-like" test (*Taus v. Loftus* (2007) 40 Cal.4th 683, 714 [54 Cal.Rptr.3d, 151 P.3d 1185]), accepting as true the evidence favorable to the plaintiff and evaluating the defendant's evidence only to determine whether it defeats the plaintiff's evidence as a matter of law

5

(*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 823 [33 Cal.Rptr.2d 446], disapproved on other grounds in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, fn. 5).  The evidence put forward at this stage must be admissible; even allegations in a verified complaint are insufficient.  (*Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169, 1212 [128 Cal.Rptr.3d 205].)

"In addition to considering the substantive merits of the plaintiff's claims," the court "must also consider all available defenses to the claims . . . ."  (*No Doubt v. Activision Publishing, Inc.* (2011) 192 Cal.App.4th 1018, 1026.)  When a cause of action states multiple grounds for relief, "the plaintiff may satisfy its obligation in the second prong by simply showing a probability of prevailing on any" one of those grounds.  (*Wallace v. McCubbin, supra*, 196 Cal.App.4th at p. 1212.)

" 'Defamation consists of, among other things, a false and unprivileged publication, which has a tendency to injure a party in its occupation.  [Citations.]' [Citation.]  ' "The sine qua non of recovery for defamation . . . is the existence of falsehood.' [Citation.]"  (*Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 695 [142 Cal.Rptr.3d 40] (*Summit Bank*).)  Papaliolios contends his Yelp review of the Jones Building is, given its context, mere opinion and thus not actionable, or in the alternative, is substantially true.

### *Provably False Assertion of Fact*

To be libelous, a " 'statement must contain a provable falsehood' " and, to this end, " 'courts distinguish between statements of fact and statements of opinion for purposes of defamation liability.' "  (*Summit Bank*, *supra*, 206 Cal.App.4th at p. 695.)

Not all statements that appear to be opinions, however, are immunized.  (*Summit Bank*, *supra*, 206 Cal.App.4th at p. 696.)  "In *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 17 [111 L.Ed.2d 1, 110 S.Ct. 2695] (*Milkovich*), the United States Supreme Court moved away from the notion that defamatory statements categorized as opinion as opposed to fact enjoy wholesale protection under the First Amendment.  Significantly,

the court recognized that 'expressions of "opinion" may often imply an assertion of objective fact.' (*Milkovich*, at p. 18.) The court went on to explain: 'If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications . . . .' (*Id.* at pp. 18–19.)" (*Overstock.com*, *supra*, 151 Cal.App.4th at p. 701; cf. *Weller v. American Broadcasting Companies., Inc.* (1991) 232 Cal.App.3d 991, 1004 [283 Cal.Rptr. 644] (*Weller*) ["we reject the notion that merely couching an assertion of a defamatory fact in cautionary language such as 'apparently' or 'some sources say' or even putting it in the form of a question, necessarily defuses the impression that the speaker is communicating an actual fact"].)

"Thus a false statement of fact, whether expressly stated or implied from an expression of opinion, is actionable. (*Milkovich, supra,* 497 U.S. at p. 19.) The key is not parsing whether a published statement is fact or opinion, but 'whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact.' (*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 385 [10 Cal.Rptr.3d 429], citing *Milkovich, supra,* 497 U.S. at p. 19, among other authority.)" (*Overstock.com*, *supra*, 151 Cal.App.4th at p. 701.) For example, "an opinion based on implied, undisclosed facts is actionable if the speaker has no factual basis for the opinion" but "[a]n opinion is not actionable if it discloses all the statements of fact on which the opinion is based and those statements are true." (*Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456, 1471 [37 Cal.Rptr.3d 133] (*Ruiz*).)

To decide whether a statement expresses or implies a provably false assertion of fact, courts use a totality of the circumstances test. (*Summit Bank*, *supra*, 206 Cal.App.4th at p. 696.) "[A] court must put itself in the place of an average reader

7

and determine the natural and probable effect of the statement . . . ." (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1011 [113 Cal.Rptr.2d 625].) Thus, a court considers both the language of the statement and the context in which it is made. (*Ibid.*; *Summit Bank*, *supra*, 206 Cal.App.4th at p. 696.) "The contextual analysis requires that courts examine the nature and full content of the particular communication, as well as the knowledge and understanding of the audience targeted by the publication." (*Overstock.com*, *supra*, 151 Cal.App.4th at p. 701.)

The " 'crucial question of whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court.' " (*Summit Bank*, *supra*, 206 Cal.App.4th at p. 696.) But if a statement is "ambiguous and cannot be characterized as factual or nonfactual as a matter of law," a jury must determine whether the statement contains an actionable assertion of fact. (*Kahn v. Bower* (1991) 232 Cal.App.3d 1599, 1607–1608 [284 Cal.Rptr. 244]; see also *Summit Bank, supra*, 206 Cal.App.4th at p. 696; *Carver v. Bonds* (2005) 135 Cal.App.4th 328, 347 [37 Cal.Rptr.3d 480], quoting *Weller*, *supra*, 232 Cal.App.3d at p. 1001, fn. 8; *Ruiz, supra*, 134 Cal.App.4th at p. 1471; accord, *Manufactured Home Communities, Inc. v. County of San Diego* (9th Cir. 2008) 544 F.3d 959, 963.)

"The allocation of functions between court and jury with respect to factual content is analogous to the allocation with respect to defamatory meaning in general. On the latter issue, the court must first determine as a question of law whether the statement is reasonably susceptible of a defamatory interpretation; if the statement satisfies this requirement, it is for the jury to determine whether a defamatory meaning was in fact conveyed to the listener or reader. [Citations.] Similarly, it is a question of law for the court whether a challenged statement is reasonably susceptible of an interpretation which implies a provably false assertion of actual fact. If that question is answered in the affirmative, the jury may be called upon to determine whether such an interpretation was in fact conveyed." (*Kahn v. Bower*, *supra*, 232 Cal.App.3d at p. 1608.)

Looking at the totality of the circumstances in this case, we conclude Papaliolios's review was "reasonably susceptible of an interpretation which implies a provably false assertion of fact." (*Kahn v. Bower*, *supra*, 232 Cal.App.3d at p. 1608.)

First, we look at Papaliolios's language. Although he used some hyperbole and name-calling—"sociopathic narcissist," "celebrates making the lives of tenants hell," "other abhorrent behaviors"—the review also included purported *facts* about the Jones Building. He asserted plaintiffs sought to evict six tenants, and further stated details about the alleged eviction of tenants from unit 902 after they "put tens of thousands of dollars into their unit." He further asserted plaintiffs' activities "(likely) contributed" to the "deaths" of three particular tenants, "Pat, Mary, and John," and to the departure of tenants in eight particular units "(1001, 902, 802, 801, 702, 701, 602, 502) in very short order." Hedging his statements with the word "likely" does not insulate them from examination. (See *Milkovich*, *supra*, 497 U.S. at p. 18 [" 'In my opinion John Jones is a liar' . . . implies a knowledge of facts which lead to the conclusion that Jones told an untruth."]; *Weller*, *supra*, 232 Cal.App.3d at p. 1004 ["we reject the notion that merely couching an assertion of a defamatory fact in cautionary language such as 'apparently' or 'some sources say' . . . , necessarily defuses the impression that the speaker is communicating an actual fact"].) In fact, Papaliolios went out of his way to win credibility with his audience as to these factual assertions, stating:

> "This is my own first-hand experience with this building, and its owners. I know this situation well, as I had the misfortune of being in a relationship with one of the building's residents at the time, have spent many days and nights over many years in the building, and have personally witnessed the abhorrent behavior of the owners of the building."

Such assurances suggest facts are being communicated, not opinions. (See David A. Elder, Defamation: A Lawyer's Guide (2012) Fact Versus Opinion, § 8:2 [representation that speaker has "private, firsthand knowledge" relevant to the fact/opinion distinction]; see also *Super Future Equities, Inc. v. Wells Fargo Bank Minnesota, N.A.* (N.D. Tex.

2008) 553 F.Supp.2d 680, 689 [where defendant "claims to verify the accuracy of the information he posts" his online "statements are not protected opinions"].)

We next turn to the broader context of his statements—posting on an Internet site under an assumed user name. Papaliolios contends Internet fora are notorious as "places where readers expect to see strongly worded opinions rather than objective facts," and that "anonymous, or pseudonymous," opinions should be " 'discount[ed] . . . accordingly.' " (*Summit Bank*, *supra*, 206 Cal.App.4th at pp. 696–697.) However, the mere fact speech is broadcast across the Internet by an anonymous speaker does not ipso facto make it nonactionable opinion and immune from defamation law.

To be sure, anonymous Internet fora "promote[] a looser, more relaxed communication style" in which users may "substitute gossip for accurate reporting and often adopt a provocative, even combative tone." (*Krinsky v. Doe 6* (2008) 159 Cal.App.4th 1154, 1162–1163 [72 Cal.Rptr.3d 231] (*Krinsky*) ["online discussions may look more like a vehicle for emotional catharsis than a forum for the rapid exchange of information and ideas"]; *id.* at p. 1163 [" 'online pseudonyms tends to heighten this sense that "anything goes," and some commentators have likened cyberspace to a frontier society free from the conventions and constraints that limit discourse in the real world' "]; *Summit Bank*, *supra*, 206 Cal.App.4th at p. 697; *Chaker v. Mateo* (2012) 209 Cal.App.4th 1138, 1148 [147 Cal.Rptr.3d 496] (*Chaker*).)

Thus in *Krinsky*, the defendant, using a concealing screen name on an Internet discussion forum, felt free to claim a corporate president was part of a management team of " 'boobs, losers, and crooks' " and " 'has fat thighs, a fake medical degree, "queefs" and has poor feminine hygiene.' " (*Krinsky*, *supra*, 159 Cal.App.4th at p. 1159.) The plaintiff served a subpoena on the forum's host seeking the defendant's identity and defendant, appearing as "Doe 6," moved to quash. (*Id.* at pp. 1158–1159.) The appellate court, viewing the defendant's posts in the context of what was a particularly "[h]eated" discussion forum in which numerous other posts questioned defendant's credibility, and

10

noting the defendant's "crude, ungrammatical" language, satirical tone, and vituperative, "juvenile name-calling," concluded the defendant's railing was nonactionable opinion and ordered the subpoena quashed.[4] (*Krinsky*, *supra*, 159 Cal.App.4th at pp. 1175–1177.)

Similarly, in *Summit Bank*, the defendant posted under a pseudonym, "in a section of the Craigslist Web site entitled 'Rants and Raves,' " "free-flowing diatribes (or 'rants')" about a bank that lacked "proper spelling or grammar."  The Court of Appeal concluded readers would be predisposed to view the comments "with a certain amount of skepticism, and with an understanding that they will likely present one-sided viewpoints rather than assertions of provable facts."  (*Summit Bank*, *supra*, 206 Cal.App.4th at pp. 680, 696, 699 & fn. 10.)  Thus, statements that the bank's CEO " 'thinks that the Bank is her personel [*sic*] Bank to do with it as she pleases,' " that the bank was a "problem bank," and that the bank left clients " 'high and dry,' " were nonactionable, and the appellate court reversed the denial of an anti-SLAPP motion.  (*Id.* at pp. 699, 701.)

In *Chaker,* the court confronted a "series of derogatory statements" on the Ripoff Report "Internet Web site where members of the public may comment on the reliability and honesty of various providers of goods and services" and on Topix, "a social networking site."[5]  (*Chaker*, *supra*, 209 Cal.App.4th at pp. 1142, 1146.)  The defendant wrote of plaintiff:  " 'This guy is a criminal and a deadbeat dad.  As you can see, I am the child's grandma so I know.  If you should eve [*sic*] come across this person, be very careful.  He may be taking steroids so who knows what could happen.'  'I would be very

---

[4] Even the " 'fake medical degree' " comment "was only the latest entry in a protracted online debate about whether plaintiff's medical degree from Spartan Health Sciences University in the West Indies justified her use of the 'M.D.' title in company documents.  No reasonable reader would have taken this post seriously . . . ."  (*Krinsky*, *supra*, 159 Cal.App.4th at p. 1177.)

[5] It is unclear which statements appeared where and although the opinion suggests the statements were anonymous, it does not say so.

careful dealing with this guy.  He uses people, is into illegal activities, etc . . . .' " (*Id*. at p. 1142.)  The Court of Appeal concluded "alleged embellishments, to the effect [the plaintiff] picks up streetwalkers and homeless drug addicts and is a deadbeat dad," were too generalized, nonspecific, and vitriolic to be actionable.  (*Id.* at pp. 1149–1150.)  "The only statement which might arguably fall outside the scope of nonactionable opinion or epithet [was] the statement Mateo is a criminal.  However, that statement [was] true." (*Id.* at p. 1150.)  Accordingly, the Court of Appeal affirmed the grant of an anti-SLAPP motion.  (*Ibid.*)

 *Krinsky*, *Summit Bank*, and *Chaker* illustrate the significant role context plays in distinguishing fact from opinion, but by no means do they categorically immunize anonymous Internet speech or even give anonymity special weight.  While *Krinsky* recognizes the long-enduring right to speak anonymously in a lawful manner, it warns, on the Internet, the "informal ability to 'sound off' often in harsh and unbridled invective, . . . opens the door to libel and other tortious conduct," and "[w]hen vigorous criticism descends into defamation, . . . constitutional protection is no longer available." (*Krinsky*, *supra*, 159 Cal.App.4th at pp. 1163–1164 [further warning "criticism on the Internet is often so recklessly communicated that the harm to its targets, particularly in the financial arena, may extend far beyond what is covered by rules applicable to oral rhetoric and pamphleteering"].)  While the defendant's anonymity in *Krinsky* may have freed him to engage in "crude, satirical hypberole," it was the overall nature and context of his comments, not his anonymity, that led the court to conclude the comments nonactionable. (*Id.* at pp. 1175–1178.)

 Likewise, in *Summit Bank* and *Chaker*, the courts examined a variety of contextual factors.  The anonymity of the defendant in *Summit Bank* appeared relevant to that court, but so was the name of the forum the defendant used—"Rants and Raves"—as well as the posts' "diatribe" nature, lack of formality, poor grammar and spelling.  (*Summit Bank*, *supra*, 206 Cal.App.4th at pp. 697–699.)  In *Chaker*, the court, citing *Krinsky* and *Summit*

12

*Bank*, noted "a number of recent cases have relied heavily on the fact that statements were made in Internet forums" (*Chaker*, *supra*, 209 Cal.App.4th at p. 1148), but went on to analyze other aspects of the defendant's speech, such as its "angry" and "generalized" character and "lack any specificity." (*Id.* at pp. 1149–1150.)

Thus, while *Krinsky*, *Summit Bank*, and *Chaker* allow courts to dispense quickly with defamation claims arising from true rants and raves, they do not preclude the courts from taking serious Internet speech seriously. Internet posts where the "tone and content is serious," where the poster represents himself as "unbiased" and "having specialized knowledge," or where the poster claims his posts are "Research Reports" or "bulletins" or "alerts," may indeed be reasonably perceived as containing actionable assertions of fact. (*Overstock.com*, *supra*, 151 Cal.App.4th at pp. 705–706.) And while "generalized" comments on the Internet that "lack any specificity as to the time and place of" alleged conduct may be a "further signal to the reader there is no factual basis for the accusations," specifics, if given, may signal the opposite and render an Internet posting actionable. (See *Chaker*, *supra*, 209 Cal.App.4th at pp. 1149–1150 [making this distinction but finding the comments at issue too generalized to support a defamation claim]; cf. *ComputerXpress, Inc. v. Jackson*, *supra*, 93 Cal.App.4th at p. 1013 [though generally dismissing Internet postings as nonactionable, suggesting that in a "few instances in which the postings did contain apparent statements of facts—such as the statement that a company owned by the former president had filed for bankruptcy"—they could have been actionable had there been evidence of falsehood].)

This brings us to *Wong v. Jing* (2010) 189 Cal.App.4th 1354 [117 Cal.Rptr.3d 747] (*Wong*), which dealt with more serious Internet speech and rounds out the discussion on the topic. In *Wong*, the Court of Appeal affirmed the denial of an anti-SLAPP motion in a defamation action based on a review on Yelp, the same forum Papaliolios used. The review, of a dentist, read:

13

" '1 star rating. . . . [¶] Let me first say I wish there is [*sic*] "0" star in Yelp rating. Avoid her like a disease! [¶] My son went there for two years. She treated two cavities plus the usual cleaning. She was fast, I mean really fast. I won't necessarily say that is a bad thing, but my son was light headed for several hours after the filling. So we decided to try another dentist after half a year. [¶] I wish I had gone there earlier. First the new dentist discovered seven cavities. All right all of those appeared during the last half a year. Second, he would never use the laughing gas on kids, which was the cause for my son's dizziness. To apply laughing gas is the easiest to the dentist. There is no waiting, no needles. But it is general anesthetic, not local. And general anesthetic harms a kid's nerve system. Heck, it harms mine too. Third, the filling Yvonne Wong used is metallic silver color. The new dentist would only use the newer, white color filling. Why does the color matter? Here is the part that made me really, really angry. The color tells the material being used. The metallic filing, called silver amalgams [*sic*], has a small trace of mercury in it. The newer composite filling, while costing the dentist more, does not. In addition, it uses a newer technology to embed fluoride to clean the teeth for you. [¶] I regret ever going to her office. [¶] P.S. Just want to add one more thing. Dr Chui, who shares the same office with Yvonne Wong is actually decent.' " (*Wong*, *supra*, 189 Cal.App.4th at p. 1361.)

The dentist claimed the review was libelous per se because it falsely implied the following facts: "(1) Wong 'had failed to tell [Jing and Ma that their] son's filling contained mercury'; (2) Wong 'mis-diagnosed the case'; [and] (3) Wong 'used a General Anesthetic,' " something beyond her allowed scope of practice. (*Wong, supra*, 189 Cal.App.4th at p. 1370.) The appellate court agreed Wong had carried her burden under the second prong of the anti-SLAPP analysis because: "a jury reasonably could find that the review falsely implied that Wong had failed to warn and advise about silver amalgam and arguably better alternatives to its use" (*id.* at p. 1372); "a reasonable person could probably understand these statements to be criticism of Wong for working hastily, failing to find all of the cavities that the boy had, and thereby substantially misdiagnosing or underdiagnosing the condition of the boy's teeth" (*id.* at pp. 1373–1374); and "a jury reasonably could find that the implied assertion that to make her job easier and quicker, Wong put defendant's son under general anesthesia to fill his cavities, exposed the boy's

14

nervous system to potential harm and harmed him was false and defamatory" (*id.* at p. 1375).

Papaliolios's Yelp review is every bit as factually specific and earnest as the Yelp review in *Wong.* While Papaliolios's review does contain epithets not meant to be taken as serious assertions of fact, it also contains statements that could reasonably be understood as conveying facts—each provable, and each meant to be used by prospective tenants to evaluate the Jones Building as a future residential choice.

Papaliolios asserts *Wong* is distinguishable because it did not involve "anonymous" speech. The review at issue in *Wong* "did not state the name of the person who wrote the review, but it did reveal the person's initials—T.J." (*Wong*, *supra*, 189 Cal.App.4th at p. 1368.) Papaliolios wrote as "Sal. R." We see no meaningful distinction between the identifying information in *Wong* and in this case—in both cases, the consuming public had no way of identifying the poster from the reviews. Moreover, as we have discussed, anonymity is only one of many contextual factors to be considered. (See *Krinsky*, *supra*, 159 Cal.App.4th 1154, 1163–1164 ["targets" of anonymous "online aspersions may seek redress by filing suit against their unknown detractors"].)[6] Here,

---

[6] Other jurisdictions concur that speaking anonymously or with a pseudonym on the Internet does not immunize the speaker from liability. (E.g., *In re Indiana Newspapers Inc.* (Ind. Ct. App. 2012) 963 N.E.2d 534, 549 ["Although free speech is vigorously protected, a statement will not be afforded constitutional protection if it is defamatory."]; *Mortgage Specialists, Inc. v. Implode-Explode Heavy Industries, Inc.* (2010) 160 N.H. 227, 237 [" 'viable causes of actions for defamation' " against speakers using pseudonyms "should not be barred in the Internet context"]; *Maxon v. Ottawa Pub. Co.* (Ill. App. Ct. 2010) 402 Ill.App.3d 704, 713 [finding no "support [for] the proposition that anonymous Internet speakers enjoy a higher degree of protection from claims of defamation than" others]; *In re Greenbaum* (N.Y. Sup. Ct. 2007) 18 Misc.3d 185, 187 ["cases also recognize, however, that the right of anonymous speech is not absolute and cannot shield tortious acts such as defamation" ]; *John Doe No. 1 v. Cahill* (Del. 2005) 884 A.2d 451, 456 ["First Amendment does not protect defamatory speech"]; see generally Raymond T. Nimmer & Holly K. Towle, Law of Electronic Commercial Transactions Scope Information (2007) Liability for Informational Content, ¶ 10.05[2] [agreeing with courts finding no blanket protection for anonymous Internet speech].)

given other contextual considerations, Papaliolios's use of a pseudonym does not render his Yelp review incapable of being reasonably susceptible of a defamatory interpretation.

***Substantial Truth***

Papaliolios alternatively argues that even if his review contains express or implied statements of provable fact, and even if some of his statements are false, the gist of his review is true, and truth is a complete defense to a libel claim.  (*Summit Bank*, *supra*, 206 Cal.App.4th at p. 697.)  Indeed, even "substantial truth" is a defense.  (*Ibid.*)  "[T]he law does not require [the defendant] to justify the literal truth of every word of the allegedly defamatory content, nor must we parse each word . . . to determine its truthfulness.  'It is sufficient if the defendant proves true the substance of the charge, irrespective of slight inaccuracy in the details, "so long as the imputation is substantially true so as to justify the 'gist or sting' of the remark . . . ." [Citation.]' " (*Ibid.*, italics omitted.)

"By the same token, not every word of an allegedly defamatory publication has to be false and defamatory to sustain a libel action.  See *Masson*[ *v. New Yorker Magazine, Inc.* (1991) 501 U.S. 496,] 510 [115 L.Ed.2d 447, 111 S.Ct. 2419] (interpreting California law, the Court explained, '[T]he test of libel is not quantitative; a single sentence may be the basis for an action in libel even though buried in a much longer text . . . .')" (*Kaelin v. Globe Communications Corp.* (9th Cir. 1998) 162 F.3d 1036, 1040.)  " 'Put another way, the statement is not considered false unless it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced."  [Citations.]' [Citation.]" (*Hughes v. Hughes* (2004) 122 Cal.App.4th 931, 936 [19 Cal.Rptr.3d 247].)  Or yet another way, "[i]f any *material* part be not proved true, the plaintiff is entitled to damages in respect to that part." (*Shumate v. Johnson Publishing Co.* (1956) 139 Cal.App.2d 121, 132 [293 P.2d 531], italics added.)

When evaluating an affirmative defense in connection with the second prong of the analysis of an anti-SLAPP motion, the court, following the summary-judgment-like

16

rubric, generally should consider whether the defendant's evidence in support of an affirmative defense is sufficient, and if so, whether the plaintiff has introduced contrary evidence, which, if accepted, would negate the defense. (*Dwight R. v. Christy B.* (2013) 212 Cal.App.4th 697, 715 [151 Cal.Rptr.3d 406]; *Traditional Cat Assn., Inc. v. Gilbreath* (2004) 118 Cal.App.4th 392, 398, 404 [13 Cal.Rptr.3d 353].)[7]

Among the express and implied factual assertions made by Papaliolios, perhaps the standout is that the "deaths" of three former Jones Building tenants were "(likely)" connected to plaintiffs' conduct. Papaliolios presented no evidence whatsoever as to the nature and cause of these "deaths." He offered only speculation the statement was true enough, since "dust and debris" from unspecified construction at the building may have had, or may some day have, some unspecified deleterious effects on tenants. Plaintiffs, on the other hand, offered evidence two of the three supposedly dead tenants are, in fact, alive, and the other died of pneumonia and cancer. We do not agree, as Papaliolios claims, that his assertion of three "deaths" connected to the plaintiffs' conduct is a mere

---

[7] *No Doubt v. Activision Publishing, Inc.*, *supra*, 192 Cal.App.4th at page 1029, footnote 4, noted potentially divergent statements in appellate court decisions concerning the operation of affirmative defenses in connection with anti-SLAPP motions. Some courts state a defendant bears the burden of proof on an affirmative defense. (*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 676 [35 Cal.Rptr.3d 31]; *Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2006) 136 Cal.App.4th 464, 477 [39 Cal.Rptr.3d 43]; *Seltzer v. Barnes* (2010) 182 Cal.App.4th 953, 969 [106 Cal.Rptr.3d 290].) Others state the burden ultimately remains on the plaintiff to demonstrate a defense is " ' "not applicable to the case as a matter of law or by a prima facie showing of facts which, if accepted by the trier of fact, would negate such defenses." ' " (*Birkner v. Lam* (2007) 156 Cal.App.4th 275, 285 [67 Cal.Rptr.3d 190], italics omitted, quoting *Paul for Council v. Hanyecz* (2001) 85 Cal.App.4th 1356, 1367 [102 Cal.Rptr.2d 864], disapproved on another ground in *Equilon Enterprises v. Consumer Cause, Inc.*, *supra*, 29 Cal.4th at p. 68, fn. 5; cf. *Flatley v. Mauro*, *supra*, 39 Cal.4th at p. 323 ["The litigation privilege . . . may present a substantive defense a plaintiff must overcome to demonstrate a probability of prevailing."].) Given the evidence presented in this case, we need not resolve any apparent conflict.

" 'slight inaccuracy.' " (See *Summit Bank*, *supra*, 206 Cal.App.4th at p. 697.) On this basis, alone, plaintiffs succeeded in carrying their minimal burden under the anti-SLAPP statute as to probable merit of their libel claim.

Plaintiffs also adduced evidence raising a triable issue that tenants were not sweepingly "evicted," as Papaliolios asserted. While Papaliolios responded with evidence countering plaintiffs' evidence concerning the timing and reasons for tenant departures, the present state of the evidence is, at best, murky. It certainly is not sufficiently clear to conclude Papaliolios is entitled to a defense judgment as a matter of law, even as to his statements about tenant departures, on the basis of "substantial truth."

Given these triable issues in connection with the merits of plaintiffs' libel claim, and the material nature of Papaliolios's statements to a prospective tenant, a trier of fact might conclude his review was not substantially true and was defamatory. (*Hughes v. Hughes*, *supra*, 122 Cal.App.4th at p. 937 ["whether a statement is true or substantially true is normally considered to be a factual one"]; *Kahn v. Bower*, *supra*, 232 Cal.App.3d at p. 1608 [whether statement is defamatory is for jury in close cases].)[8]

In his reply memorandum in the trial court, Papaliolios included a two-sentence footnote asserting, without citation to authority or evidence and without further explanation, that plaintiffs "are limited-purpose public figures and are required to provide evidence of malice." The footnote continued: "Given [p]laintiffs have not proven simple defamation, [Papaliolios] has not briefed the malice issue here but is prepared to provide the Court a supplemental brief on the issue upon request." There was no mention of this

---

[8] Because we conclude Papaliolios's review could be defamatory on the bases just discussed, we need not, for purposes of this anti-SLAPP analysis, analyze the showing made as to other statements in the review. (See *Masson v. New Yorker Magazine, Inc.*, *supra*, 501 U.S. at p. 510 ["It matters not under California law that petitioner alleges only part of the work at issue to be false."]; cf. *Wallace, supra*, 196 Cal.App.4th at p. 1212 ["the plaintiff may satisfy its obligation in the second prong by showing a probability of prevailing on any" grounds of a cause of action].)

18

point at the hearing on the special motion to strike, and no supplemental brief.  Nor was any mention made of it in the trial court's order denying the motion.

Nevertheless, Papaliolios attempts to raise the issue of malice on appeal, arguing plaintiffs were limited purpose public figures because they advertised on Yelp and thus fell short in their merits showing because they presented no evidence Papaliolios was motivated by actual malice.  Even if it were appropriate for Papaliolios to withhold a malice argument until his trial court reply brief (see *Wong*, *supra*, 189 Cal.App.4th at pp. 1368–1369 [suggesting arguments on "merits" prong of anti-SLAPP motion need not be raised in trial court opening brief and may be raised for first time in trial court reply brief]), his reply brief made no intelligible malice argument, lacking any authority, evidence, or analysis.  Indeed, in that brief, Papaliolios conceded he "ha[d] not briefed" the malice issue, rendering his footnote a mere placeholder.  We therefore conclude Papaliolios did not timely raise this factual issue in the trial court, and he cannot attempt to breathe life into it for the first time in this appeal.  (See *Carpenter & Zuckerman LLP v. Cohen* (2011) 195 Cal.App.4th 373, 384, fn. 6 [124 Cal.Rptr.3d 598] ["Defendants did not adequately raise this issue in the trial court and therefore forfeited the issue on appeal."]; *People v. Redd* (2010) 48 Cal.4th 691, 731–732 & fn. 19 [108 Cal.Rptr.3d 192, 229 P.3d 101] [passing reference in pleading to argument insufficient to preserve it].)

Furthermore, while use of the media to advocate on a particular public controversy can give rise to public figure status (*Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 25 [53 Cal.Rptr.3d 752]), merely advertising ones goods or services does not (*Hufstedler, Kaus & Ettinger v. Superior Court* (1996) 42 Cal.App.4th 55, 69–70 [49 Cal.Rptr.2d 551] ["a person in the business world advertising his wares does not necessarily become part of an existing public controversy"]).  The record before us in this appeal does not begin to contain the evidence necessary to conclude plaintiffs' presence on Yelp rendered them public figures.  Finally, given the tenor of the Yelp review and evidence of the parties' rancorous relationship, there is some inkling of malice here.

In sum, plaintiffs made the requisite minimal showing required under the anti-SLAPP statute as to the merits of their libel claim, and Papaliolios's special motion to strike was properly denied.

## DISPOSITION

The trial court's order denying Papaliolios's special motion to strike is affirmed. Respondents to recover costs on appeal.

_____
Banke, J.

We concur:

_____
Margulies, Acting P. J.

_____
Dondero, J.

Trial Judge:                            Honorable Harold E. Kahn
Trial Court:                            San Francisco City & County Superior Court


Stein & Lubin, Michael F. Donner and Daniel K. Slaughter for Plaintiffs and Respondents.

Dhillon & Smith, Harmeet K. Dhillon and Nitoj P. Singh for Defendant and Appellant.