Filed 3/26/14  Williams v. Cahill CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DAVID WILLIAMS, | |
| Plaintiff and Respondent, | G048301 |
| v. | (Super. Ct. No. 30-2012-00578899) |
| KELLEY CAHILL, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Franz E. Miller, Judge.  Affirmed.

Wesierski & Zurek, Thomas W. Porter, Frank J. D'Oro, David M. Ferrante and Nathaniel Clark for Defendant and Appellant.

Rufus-Isaacs Acland & Grantham and Alexander Rufus-Isaacs for Plaintiff and Respondent.

\*          \*          \*

Defendant Kelley Cahill and plaintiff David Williams met through a dating Web site and developed a romantic relationship lasting approximately one year. During that time, they bought a house under Cahill's name, lived together, and shared a joint bank account. After their relationship ended, Cahill posted numerous online warnings to women not to date Williams because he was married, he lied about being divorced, he manipulated women emotionally, and he exploited them financially. Cahill also convinced American Broadcasting Companies, Inc. (ABC) to include on its news magazine show "20/20" a segment on her relationship with Williams as part of an episode addressing the dangers of online dating. Williams refused to participate in the episode, which portrayed him as a con man who led Cahill to believe they would get married, but ultimately left her in financial ruin. The episode also suggested Williams had exploited several other women in a similar fashion over the course of more than a decade.

Williams sued Cahill for libel and she moved to strike his complaint under Code of Civil Procedure section 425.16, commonly referred to as the anti-SLAPP statute (strategic lawsuit against public participation).[1] Although the trial court found Williams's libel cause of action arose out of protected free speech activities, it denied the motion because it also found Williams established a probability of prevailing on his libel claim. The trial court based its ruling on the statements made during the 20/20 episode without expressly considering whether Williams also established a probability of prevailing on any of the other allegedly defamatory statements described in his complaint, including Cahill's online posts.

We affirm because Williams presented sufficient prima facie evidence to establish the probability he would prevail based on Cahill's statements in the

---

[1]    All statutory references are to the Code of Civil Procedure unless otherwise stated.

2

20/20 episode. In doing so, we reject Cahill's contention section 425.16 required the trial court to separately determine whether Williams established a probability of prevailing on each of the other 19 defamatory statements alleged in his complaint. To the contrary, the statute required the trial court to deny Cahill's motion once it determined Williams established a probability of prevailing on any portion of his claim. As explained below, we also reject Cahill's contention the partial settlement she reached with Williams on the statements made during the 20/20 episode prevents us from considering those statements on this appeal.

I

FACTS AND PROCEDURAL HISTORY

Williams married his high school sweetheart, Virginia, in 1983, and they have four sons.[2] In June 2004, the couple separated when Williams moved out of the family home and into his own apartment. He began seeing other women without objection from Virginia because she thought their separation freed both of them to see other people. Williams and Virginia separately consulted attorneys about obtaining a divorce, but decided against it because they did not want to spend the money to hire an attorney.

In March 2005, Williams met Cahill through Match.com. According to Williams, he identified himself as divorced in his Match.com profile because the categories the Web site provided did not distinguish between long-term and short-term separations. Williams believed divorced was the proper designation because he had been living apart from Virginia for several months and had consulted a divorce attorney.

---

[2] We refer to Virginia by her first name to avoid any confusion. No disrespect is intended. (*Martin v. PacifiCare of California* (2011) 198 Cal.App.4th 1390, 1393, fn. 1.)

Williams and Cahill met in person a few weeks later, began dating, and moved in together. He claims he told Cahill on their second date he was separated rather than legally divorced, but Cahill claims she did not learn Williams was still married until after the relationship ended more than a year later. In August 2005, Williams and Cahill decided to buy a house together to fix up and sell for a profit. Williams told Cahill they should purchase the house in her name alone because of his impending divorce. Cahill contributed the money for the down payment, which she borrowed from her family, and Williams contributed the commission he earned as the buyer's agent on the transaction and also the "sweat equity" needed to remodel the house. According to Williams, he and Cahill agreed to evenly split the monthly mortgage payments and also the profits from any future sale. When they decided to purchase a house together, Cahill and Williams also opened a joint checking account to meet common expenses.

In January 2006, Cahill refinanced the mortgage on the house and pulled out approximately $125,000 in equity. She used that money to repay her family for the down payment and to pay off her credit card debt. After those payments, approximately $14,000 remained from the refinancing that Cahill and Williams split evenly.

According to Williams, Cahill lived well beyond her financial means and repeatedly struggled to pay her half of the monthly mortgage payments. He claims he made some of Cahill's payments and on other occasions she only could make her half of the payment by obtaining cash advances on her credit cards. During their relationship, Cahill contends she purchased expensive gifts for Williams, including a $5,000 wristwatch, a new wardrobe, and a Range Rover. Williams contends the watch and wardrobe were worth much less than Cahill claims and, although she purchased the Range Rover in her name, Cahill did so with no money down and Williams made the monthly payments until he returned the vehicle to her after their relationship ended.

As their relationship progressed, Cahill grew increasingly uneasy because Williams would not introduce her to his sons. Williams explained his sons still were

4

angry about his separation from their mother and he did not want to subject Cahill to their resentment. The relationship ended in June 2006. Williams encouraged Cahill to sell the house they had purchased while they could still do so at a profit, but she refused. Instead, in October 2006, Cahill refinanced the mortgage a second time and pulled out an additional $200,000 in equity. According to Williams, Cahill used that money to pay for her extravagant lifestyle. Williams did not receive any of the equity.

In August 2006, Cahill received a letter from Williams's oldest son explaining he was "empathetic to [Cahill] as I feel we have all been lied to and deceived by my father." The letter stated Williams and Virginia were not divorced or "even legally separated" and the son knew Williams had lied to Cahill about being divorced. The son also explained Williams had visited various dating Web sites while dating Cahill and accused Williams of failing to financially support his family. Finally, the son's letter claimed Williams had punched the son in the face during a dispute and forged Virginia's signature on tax documents to keep a tax refund for himself. Cahill contends this letter was the first time she learned Williams was not divorced from Virginia.

After receiving the letter, Cahill met with Virginia. She told Virginia about her relationship with Williams, but Virginia told Cahill she already knew about the relationship. According to Virginia, Cahill admitted she knew Williams was not divorced and that she owed Williams approximately $50,000, but would rather give the money to Virginia and her sons than to Williams. Cahill remained in contact with Virginia after their meeting, but never paid either Virginia or her sons the money Cahill said she owed Williams. Instead, around 2009, Cahill began telling Virginia that Williams had defrauded her out of a significant amount of money during their relationship.

In late 2006, Williams reconciled with Virginia and the couple began living together, but they separated again in July 2007, and have reconciled and separated on a number of occasions since that time. When Williams has not been with Virginia, he has continued to date other women he meets through various dating Web sites.

5

Around 2009, Cahill began searching for other women who may have dated Williams and had a similar experience. She found a few women Williams had met through dating Web sites and told he was divorced. Cahill posted comments about Williams in a variety of online chat rooms discussing online dating experiences. In her posts, Cahill described her experience with Williams and warned other women not to date him because he lied about being divorced and preyed on women both emotionally and financially. Cahill encouraged the other women who had dated Williams to post similar online comments about him. Cahill's efforts coincided with launching her online business offering background checks for people interested in dating someone they met on a dating Web site.

In June 2011—five years after Cahill's relationship with Williams ended—ABC ran a story about the relationship as part of a 20/20 news magazine episode on the dangers of online dating. The segment on Cahill and Williams was the third of three segments providing examples of how women and men had been victimized by people they met through dating Web sites. The first two segments described how people were scammed out of thousands of dollars by con men they never met face to face and the third segment presented Cahill's story as a cautionary tale of what can happen when someone moves in with a person they met through a dating Web site.

The reporter explains that Cahill "lived the online dating dream" by "actually meeting face to face and moving in with her Romeo," who had represented he was "divorced and looking to give love one more try." The reporter then explains that Cahill claims Williams "cost her a fortune" and "led her on a road to ruin" because she was "blinded by love." According to the segment, Cahill claims she incurred substantial debt to move into a new home with Williams and to buy him expensive gifts, but later discovered not only that he was still married, but had not separated from his wife. The segment includes numerous pictures of Williams and explains that Cahill uncovered at least half a dozen other women who claim they "fell prey to Williams'[s] lies and

6

infidelity," and that Williams had been taking advantage of women in this manner for at least 11 or 12 years. Williams declined to make any comment for the show.

In June 2012, Williams filed this action against Cahill and ABC. The operative first amended complaint alleged claims against Cahill for libel and intentional infliction of emotional distress based on six statements made during the 20/20 segment; 11 online posts Cahill made warning women not to date Williams because he was a married man who lied to women, exploited them financially, and committed numerous unethical and illegal acts; an e-mail Cahill sent to a woman Williams was dating explaining Cahill lost $1.5 million because of her relationship with Williams and she knew seven other women Williams had swindled; and a video clip posted on YouTube in which Cahill implied Williams conned her out of $1.5 million. The first amended complaint also alleged libel and intentional infliction of emotional distress claims against ABC based on the same six statements from the 20/20 segment, plus one additional statement from the segment.

ABC and Cahill filed separate special motions to strike Williams's pleading under the anti-SLAPP statute and Cahill also filed a joinder in ABC's motion. Williams filed oppositions to both motions supported by his own declaration and also declarations from his counsel, Virginia, his son who wrote the letter to Cahill, a husband and wife with whom Williams and Cahill socialized while they were dating, one of the other women Cahill claims Williams exploited, a certified public accountant, and an expert on journalism ethics.

The trial court granted the motions on the intentional infliction of emotional distress claims, but denied them on the libel claims. The court found the libel claims were subject to the anti-SLAPP statute because the gravamen of the claims covered constitutionally protected speech, but refused to strike the claims because it found Williams established a probability of prevailing based on the statements in the

7

20/20 episode. The court did not expressly address any of the other defamatory statements Williams alleged to support his libel claim against Cahill.

Both Cahill and ABC appealed the trial court's decision denying their motions on the libel claims. While this appeal was pending, ABC settled with Williams and dismissed its appeal. Cahill also reached a partial settlement with Williams regarding the portion of his libel claim based on the six statements made during the 20/20 episode. No settlement has been reached on the portion of the claim based on Cahill's online posts, the e-mail, or the YouTube video.

## II

### DISCUSSION

A.    *The Anti-SLAPP Statute*

A SLAPP suit is a meritless lawsuit brought primarily to chill or punish a defendant's exercise of the constitutional rights of freedom of speech and petition for redress of grievances. A SLAPP plaintiff is not concerned with prevailing in the lawsuit, but rather seeks to "'deplete "the defendant's energy" and drain "his or her resources"'" by forcing a litigant to defend a meritless lawsuit. (*Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 463 (*Hecimovich*).) The anti-SLAPP statute therefore establishes a "'summary-judgment-like procedure'" that enables a trial court to evaluate a lawsuit's merits at an early stage and end a SLAPP suit without great cost to the defendant. (*Ibid.*; *Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 142 (*Tamkin*).) The statute also awards attorney fees and costs to a successful defendant. (§ 425.16, subd. (c).)

Specifically, section 425.16 provides, "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court

8

determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."  (§ 425.16, subd. (b)(1).)

The statute requires a court to engage in a two-step process:  "'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected [petitioning or speech] activity. . . .  If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim.'  [Citations.]"  (*Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1360 (*Wong*).)  "Only when a defendant shows that a cause of action is based on protected conduct and the plaintiff fails to show a likelihood of success on that claim is it subject to dismissal."  (*Ibid*.)

On appeal, "[w]e independently determine whether a cause of action is based upon activity protected under the statute, and if so, whether the plaintiff has established a reasonable probability of prevailing."  (*Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156, 163-164.)

B.      *Williams's Libel Cause of Action Arose from Protected Speech Activity*

To meet her initial burden under the anti-SLAPP statute Cahill must show Williams's libel cause of action is "*based on* [her] protected free speech or petitioning activity."  (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89, original italics.)  Collateral allusions to protected activity or allegations of protected activity that are only incidental to a cause of action based on unprotected activity do not render a cause of action subject to the anti-SLAPP statute.  (*Freeman v. Schack* (2007) 154 Cal.App.4th 719, 727 (*Freeman*).)  "It is 'the *principal thrust* or *gravamen* of the plaintiff's cause of action that determines whether the anti-SLAPP statute applies . . . .'"  (*Ibid*., original italics.)  "We assess the principal thrust by identifying '[t]he allegedly wrongful and injury-producing conduct . . . that provides the foundation for the claim.'  [Citation.]"  (*Hylton v. Frank E. Rogozienski, Inc.* (2009) 177 Cal.App.4th 1264, 1272 (*Hylton*).)

9

Here, Williams bases his injury claim on the allegedly libelous statements Cahill made in the 20/20 episode, her online posts, the YouTube video, and Cahill's e-mail to a woman Williams was dating. The majority of these statements warned women not to date Williams and accused him of lying in his online profiles so he could later exploit the women he met financially, sexually, and emotionally. Two of the alleged statements have a different theme, accusing Williams of beating up his son and getting fired from every job he held. The trial court found a third statement—the e-mail—was not protected speech activity because it was a private communication. We, however, need not address the propriety of that ruling or decide whether each individual statement Williams alleged constitutes protected speech because, as explained above, whether the anti-SLAPP statute applies turns on the gravamen of the cause of action, not whether each statement alleged as the basis for the claim separately constitutes protected activity. (*Hylton*, *supra*, 177 Cal.App.4th at p. 1272; *Freeman*, *supra*, 154 Cal.App.4th at p. 727.) The gravamen of Williams's libel cause of action is based on Cahill's statements made during the 20/20 episode and in her online posts about Williams and his dating practices. We therefore focus on those statements to determine whether the libel claim is based on protected speech.

A cause of action is based on protected activity if the underlying conduct fits into one of the four categories described in section 425.16, subdivision (e). (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.) The two categories at issue here are categories three and four: "(3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, [and] (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."[3] (§ 425.16, subd. (e)(3) & (4).)

_____

[3] Categories one and two are not at issue because they only apply to statements made "before," or "in connection with an issue under consideration or review

10

Categories three and four both require a defendant to show the statements involved were made "in connection with an issue of public interest." (§ 425.16, subd. (e)(3) & (4).) Category three requires the additional showing that the statements were made in a public forum, but category four requires no such showing. (*Hailstone v. Martinez* (2008) 169 Cal.App.4th 728, 736; *Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1546 (*Terry*).) Cahill need only show the alleged statements fit into one category. Consequently, Cahill satisfied her initial burden if the statements made during the 20/20 episode and in her online posts concerned an issue of public interest regardless whether the statements were made in a public forum.[4]

A statement or other conduct is in connection with an issue of public interest "if the statement or conduct concerns a topic of widespread public interest and contributes in some manner to a public discussion of the topic." (*Hall v. Time Warner, Inc.* (2007) 153 Cal.App.4th 1337, 1347.) "'[T]he issue need not be "significant" to be protected by the anti-SLAPP statute—it is enough that it is one in which the public takes an interest.' [Citation.]" (*Tamkin*, *supra*, 193 Cal.App.4th at p. 143.)

"'"[T]here should be some degree of closeness between the challenged statements and the asserted public interest [citation] . . . .' '[T]he focus of the speaker's conduct should be the public interest . . . .'" [Citation.] Nevertheless, it may encompass activity between private people.' [Citation.]" (*Hecimovich*, *supra*, 203 Cal.App.4th at

_____

by," "a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law." (§ 425.16, subd. (e)(1) & (2).) There is no legislative, executive, judicial, or other official proceeding at issue in this case.

4    Nonetheless, there is no dispute the 20/20 episode and the Web sites on which Cahill posted her warnings and comments about Williams are public forums. (*M. G. v. Time Warner, Inc.* (2001) 89 Cal.App.4th 623, 626, 629 [television news show telling story of sexual molestation in youth sports was public forum]; *Wong*, *supra*, 189 Cal.App.4th at p. 1366 ["It is settled that 'Web sites accessible to the public . . . are "public forums" for purposes of the anti-SLAPP statute'"].)

11

p. 465; *Chaker v. Mateo* (2012) 209 Cal.App.4th 1138, 1145 (*Chaker*).) "Like the SLAPP statute itself, the question whether something is an issue of public interest must be ""'construed broadly.'"" [Citations.]" (*Hecimovich*, at pp. 464-465.)

Applying these principles, *Terry* and *Chaker* demonstrate how statements regarding activities or relationships between private people nonetheless satisfy the public interest requirement when they are part of a broad public discussion. In *Terry*, the plaintiffs were youth ministers for their church. Based on parental complaints, the church conducted an investigation and prepared a report that concluded the plaintiffs had an inappropriate relationship with a teenage girl in the youth group they supervised. (*Terry*, *supra*, 131 Cal.App.4th at pp. 1539-1540.) Church leaders held a closed meeting to discuss the report and, after receiving numerous inquiries from concerned parents, decided to conduct two meetings with the parents of youth group members. The church distributed copies of the report to about 100 parents at those meetings, but collected all the copies at the end of the gatherings. (*Id*. at pp. 1542-1543.) The plaintiffs sued for defamation and other torts, but the church successfully moved to strike the complaint under the anti-SLAPP statute. (*Id*. at pp. 1539, 1543.)

The *Terry* court affirmed that decision, concluding the report and related "communications clearly involved issues of public interest, because they involved the societal interest in protecting a substantial number of children from predators . . . ." (*Terry*, *supra*, 131 Cal.App.4th at p. 1547.) The appellate court further explained, "[T]he broad topic of the report and the meetings was the protection of children in church youth programs, which is an issue of public interest. This is not to say that [the plaintiffs] in fact molested the girl. Rather, [the plaintiffs'] actions in engaging in a secretive and inappropriate relationship with the girl gave the Church and parents of youth group members cause for concern and opened for discussion the topics of whether other children were affected and how to prevent such inappropriate relationships." (*Id*. at p. 1548.)

12

In reaching its decision, the *Terry* court rejected the plaintiffs' contention that no public interest was involved because the statements related to a private relationship: "[The p]laintiffs characterize the issue in this case as a private relationship between [them] and the girl. Not so. The issue as to whether or not an adult who interacts with minors in a church youth program has engaged in an inappropriate relationship with any of the minors is clearly a matter of public interest. The public interest is society's interest in protecting minors from predators, particularly in places such as church programs that are supposed to be safe. It need not be proved that a particular adult is in actuality a sexual predator in order for the matter to be a legitimate subject of discussion." (*Terry*, *supra*, 131 Cal.App.4th at p. 1547.)

*Chaker* involved a plaintiff embroiled in a contentious paternity and child support dispute with the mother of his child. (*Chaker*, *supra*, 209 Cal.App.4th at p. 1141.) The woman's mother posted a series of derogatory comments about the plaintiff and his business on a consumer Web site where the public could comment on the reliability and honesty of service providers, and also on a social networking Web site that provided members an open forum to comment on a variety of topics. The posts warned people not to deal with the plaintiff and accused him of being a deadbeat dad, a criminal, and a fraud and also of "us[ing] people." (*Id*. at p. 1142.) The plaintiff sued the mother for defamation and she successfully moved to strike the plaintiff's complaint as a SLAPP suit. (*Ibid*.)

Although the statements arose out of a private dispute and relationship, the *Chaker* court concluded they satisfied the public interest requirement because they concerned the plaintiff's "character and business practices" and "were intended to serve as a warning to consumers about his trustworthiness." (*Chaker*, *supra*, 209 Cal.App.4th at p. 1146.) As for the social networking site posts, *Chaker* noted they occurred after the plaintiff created a profile on the site and therefore he "clearly must have recognized that

13

other participants in the Web site would have a legitimate interest in knowing about his character before engaging him on the Web site." (*Id.* at pp. 1146-1147.)

We conclude the statements from the 20/20 episode and in Cahill's online posts satisfy the public interest requirement because they contribute to the public discussion on the dangers posed by online dating. The 20/20 episode was not merely a story about Cahill's relationship with Williams, but rather an example of a broader societal problem covering a topic of interest to millions of people in a nationwide broadcast. The episode's first two segments showed how con men can manipulate the emotions of people they meet on dating sites and scam them out of thousands of dollars without ever meeting them face to face. The segment on Cahill and Williams discussed how the dangers continue in a personal relationship with someone from a dating site. The segment includes an interview with Match.com's CEO on the efforts it makes to identify and remove potentially dangerous individuals from its site and the importance of users taking an active role in protecting themselves. The broad societal interest in these topics is further emphasized by the "Joint Statement of Key Principles of Online Dating Site Safety" (Mar. 2012) [http://ag.ca.gov/cms_attachments/press/pdfs/n2647_agreement.pdf] that the California Attorney General and general counsels for several dating Web sites issued a few months after the 20/20 episode. Although the specific statements at issue concern a private relationship between Cahill and Williams, those statements formed part of a broader public discussion that satisfied the public interest requirement. (*Terry*, *supra*, 131 Cal.App.4th at pp. 1547-1548.)

Similarly, the statements in Cahill's online posts were part of a broader discussion warning women of the danger Williams allegedly posed to women he met through dating Web sites. Much like the statements in *Chaker*, the statements here related to Williams's character and were intended to warn women about the risks they faced if they dated him. By creating profiles on multiple sites, and then dating several women he met through those sites, Williams should have expected the women using the

14

sites would have a legitimate interest in knowing about the dating experiences other women had with him. (*Chaker*, *supra*, 209 Cal.App.4th at pp. 1146-1147.) Williams argues *Chaker* does not apply because the subject concerned consumer Web sites, but that distinction does not withstand scrutiny either factually or logically. *Chaker* involved posts on two sites, only one of which was a consumer site. The other site was a social networking site that provided an open discussion forum similar to the sites Cahill joined to post her comment about Williams. (*Id*. at pp. 1142, 1146-1147.) Moreover, even the consumer site in *Chaker* is analogous to the sites Cahill used because they also provided a forum for people to share their experiences regarding a particular type of service they received. It is irrelevant that the site in *Chaker* discussed experiences with professional service providers and the sites Cahill used discussed experiences with men the users met through dating sites.

Accordingly, Cahill has met her initial burden to show Williams based his libel cause of action on protected speech and the burden now shifts to Williams to establish a probability of prevailing on his claim.

## C. *Williams Established a Probability of Prevailing on His Libel Cause of Action*

### 1. Section 425.16 Requires a Probability of Prevailing on Any Portion of the Challenged Cause of Action

Cahill contends section 425.16 requires a trial court to strike portions of a cause of action, and therefore the court erred by failing to determine whether Williams established a probability of prevailing on each of the 19 defamatory statements he alleged as the basis for his libel cause of action. We disagree.

"The anti-SLAPP statute authorizes the court to strike a cause of action, but unlike motions to strike under section 436, it cannot be used to strike particular allegations within a cause of action." (*A.F. Brown Electrical Contractor, Inc. v. Rhino Electric Supply, Inc.* (2006) 137 Cal.App.4th 1118, 1124; compare § 425.16, subd. (b)(1)

15

["A cause of action against a person . . . shall be subject to a special motion to strike"] and § 436 [authorizing a court to strike "all or any part of any pleading"]; see *Guessous v. Chrome Hearts, LLC* (2009) 179 Cal.App.4th 1177, 1187 ["section 425.16 applies only to a cause of action, not to a remedy"]; *Marlin v. Aimco Venezia, LLC* (2007) 154 Cal.App.4th 154, 162 ["A SLAPP motion must be based on a cause of action, not a prayer for relief" (capitalization omitted)].)

To defeat an anti-SLAPP motion, a plaintiff therefore needs to establish only a probability of prevailing on "'*any part*'" of the challenged cause of action. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820, original italics (*Oasis*); *Burrill v. Nair* (2013) 217 Cal.App.4th 357, 379 (*Burrill*); *Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169, 1211-1212 (*Wallace*); *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 106 (*Mann*).) As explained above, the purpose of the anti-SLAPP statute is to prevent meritless litigation designed to chill the exercise of First Amendment rights. (*Hecimovich*, *supra*, 203 Cal.App.4th at p. 463.) "'[O]nce a plaintiff shows a probability of prevailing on any part of its claim, the plaintiff *has established* that its cause of action has some merit and the entire cause of action stands.' [Citation.]" (*Oasis*, at p. 820, original italics; *Burrill*, at p. 379; *Wallace*, at pp. 1211-1212; *Mann*, at p. 106 ["Thus, a court need not engage in the time-consuming task of determining whether the plaintiff can substantiate all theories presented within a single cause of action and need not parse the cause of action so as to leave only those portions it has determined have merit"].)

In *Oasis*, a real estate development business sued its former attorney for breach of fiduciary duty, professional negligence, and breach of contract when the attorney withdrew from representing the business on a proposed redevelopment project and later joined a community campaign to defeat the same project. The trial court denied the attorney's anti-SLAPP motion to strike the business's entire complaint. (*Oasis*, *supra*, 51 Cal.4th at pp. 816-819.) The Supreme Court affirmed that decision because it

16

found the business had established a probability of prevailing on one of several alleged acts of misconduct. The *Oasis* court found it unnecessary to address whether the business established a probability of prevailing on any other alleged misdeeds, explaining, "The complaint identifies a number of acts of alleged misconduct and theories of recovery, but for purposes of reviewing the ruling on an anti-SLAPP motion, it is sufficient to focus on just one." (*Id*. at p. 821.)

*Wallace* summarized the Supreme Court's *Oasis* decision: "*Oasis* clearly holds that, where a cause of action (count) is based on protected activity, the entire cause of action may proceed as long as the plaintiff shows a probability of prevailing on at least *one* of the asserted bases for liability. [¶] . . . Indeed, not only does *Oasis* permit the entirety of the cause of action to go forward, it precludes consideration of the merit of any other claims in the cause of action once a probability of prevailing is demonstrated as to one of them." (*Wallace*, *supra*, 196 Cal.App.4th at p. 1211, original italics.)

In *Burrill*, the Court of Appeal applied this rule in a defamation action that, like this action, alleged the defendant uttered numerous defamatory statements. (*Burrill*, *supra*, 217 Cal.App.4th at pp. 379, 382.) There, a father made several statements critical of a court-appointed reunification counselor who filed a report that subjected the father to a domestic violence restraining order and significant restrictions on his child visitation rights. The father made different comments in several online blogs, during a radio interview, and in a flyer he distributed in the counselor's neighborhood. (*Id*. at pp. 364-365.) The counselor sued the father for defamation based on those statements and the father brought an anti-SLAPP motion. The trial court denied the motion because it found the counselor had established a probability of prevailing on her claim. (*Id*. at pp. 376-378.) In affirming the trial court ruling, the *Burrill* court applied *Oasis* and held the counselor need only show a probability of prevailing on one of the numerous defamatory statements to defeat the motion. (*Id*. at p. 383.)

17

Based on these authorities, we conclude section 425.16 did not require the trial court to determine whether Williams established a probability of prevailing on each of the 19 defamatory statements he alleged. Once the trial court found Williams established some merit to his libel cause of action by showing a probability of prevailing on at least one statement, the court was entitled to deny the motion without considering the remaining statements. (*Oasis*, *supra*, 51 Cal.4th at pp. 820-821; *Burrill*, *supra*, 217 Cal.App.4th at pp. 379, 383; *Wallace*, *supra*, 196 Cal.App.4th at p. 1211; *Mann*, *supra*, 120 Cal.App.4th at p. 106.) Cahill disagrees with this conclusion, but the authorities she cites either do not support her position or are readily distinguishable.

*Taus v. Loftus* (2007) 40 Cal.4th 683 (*Taus*), is the principal authority Cahill cites to support her contention that a court must separately rule on each protected activity alleged in a single cause of action, and must strike any allegation on which the plaintiff fails to establish a probability of prevailing. In *Taus*, the plaintiff sued the defendants on four causes of action based on numerous statements they made about the plaintiff in articles and lectures on suppressed memories of childhood abuse. (*Id*. at pp. 689, 701-702.) The trial court granted the defendants' anti-SLAPP motion in part and denied it in part by striking two causes of action as to some defendants and three causes of action as to other defendants. (*Id*. at p. 702.) The Court of Appeal affirmed the trial court's ruling striking some of the plaintiff's causes of action, but reversed the ruling on portions of the causes of action the trial court allowed to remain. Specifically, the Court of Appeal concluded the trial court should have struck some of the statements the plaintiff alleged as the basis for the remaining causes of action even though the appellate court allowed those claims to remain based solely on four of the many statements the plaintiff alleged. (*Id*. at pp. 703-704, 711.) The Supreme Court granted the defendants' petition for review to decide only whether the four statements the Court of Appeal allowed to remain were protected activities and whether the plaintiff could establish a probability of prevailing on any claim based on those statements. (*Id*. at pp. 703,

18

711-712, 714-715.)  The Supreme Court concluded that all four statements were protected activities, but the plaintiff established a probability of prevailing on only one of them.  (*Id*. at p. 742.)

Accordingly, the *Taus* court struck all but one portion of one cause of action under the anti-SLAPP statute, but it did so without addressing whether the statute authorized a court to strike a portion of a cause of action or whether the statute required a ruling on every protected act alleged in the challenged cause of action.  (*Taus*, *supra*, 40 Cal.4th at pp. 712-714, 742.)  ""It is axiomatic that cases are not authority for propositions not considered."  [Citations.]"  (*Silverbrand v. County of Los Angeles* (2009) 46 Cal.4th 106, 127.)  Moreover, *Oasis* was decided four years after *Taus* and it expressly held a cause of action may not be stricken if the plaintiff establishes a probability of prevailing on any portion of the cause of action.  (*Oasis*, *supra*, 51 Cal.4th at pp. 820-821.)  Although *Oasis* did not expressly address *Taus*, subsequent cases have held that *Oasis* implicitly overruled *Taus*.  (*Burrill*, *supra*, 217 Cal.App.4th at p. 380; *Wallace*, *supra*, 196 Cal.App.4th at p. 1211; see *City of Colton v. Singletary* (2012) 206 Cal.App.4th 751, 794 (dis. opn. of Richli, J.) (*Colton*).)  We are bound to follow *Oasis* as the most recent Supreme Court precedent on this issue.  (*Burrill*, at p. 382.)

Cahill also relies on *Colton* and *Cho v. Chang* (2013) 219 Cal.App.4th 521 (*Cho*).  Although these cases allowed a trial court to strike portions of a cause of action under the anti-SLAPP statute, they are readily distinguishable.  *Colton* and *Cho* involved a single or mixed cause of action based on both protected and unprotected activity. *Colton* and *Cho* struck the portions of the causes of action based on protected activity because the plaintiffs failed to establish a probability of prevailing, but allowed parts of the causes of action based on unprotected activity to remain because the plaintiffs showed a probability of prevailing.  (*Colton*, *supra*, 206 Cal.App.4th at pp. 772-773; *Cho*, at pp. 525, 527.)  Accordingly, the plaintiffs in *Colton* and *Cho* failed to meet their burden under the second prong of the anti-SLAPP analysis because they failed to show a

19

probability of prevailing on any protected activity.  Here, as explained below, we conclude Williams established a probability of prevailing on at least some of the protected statements he alleged as the basis for his libel cause of action, and therefore *Colton* and *Cho* do not apply.[5]

Moreover, we decline to follow *Colton* and *Cho* because they relied on *Taus* without explaining why *Oasis* did not apply.  *Colton* failed to even acknowledge *Oasis* (*Colton*, *supra*, 206 Cal.App.4th at pp. 773-774) and *Cho* explained it did not read *Oasis* as broadly as the decisions that concluded *Oasis* implicitly overruled *Taus* (*Cho*, *supra*, 219 Cal.App.4th at p. 527).  *Cho* explained it allowed the trial court to strike part of the cause of action because otherwise a plaintiff could tactically limit the reach of the anti-SLAPP statute by deliberately pleading a mixed cause of action.  (*Ibid*.)  This reasoning is at odds with the purpose of the anti-SLAPP statute and the *Oasis* holding. The statute is designed to prevent plaintiffs from filing meritless claims to chill protected speech.  Once the complainant has shown the cause of action has merit, the rationale for quickly disposing of meritless claims no longer applies.  As *Oasis* notes, a probability of prevailing on any part of a cause of action will defeat an anti-SLAPP attack.  (*Oasis*, *supra*, 51 Cal.4th at p. 820.)  *Cho*'s concern over tactical pleading undermining the reach

---

5       Because we conclude Williams established a probability of prevailing on at least some of the protected statements, we do not address whether he could have defeated Cahill's anti-SLAPP motion by showing a probability of prevailing on unprotected activity.  The language from *Mann* on which *Oasis* relies—"[i]f the plaintiff 'can show a probability of prevailing on *any part of its claim*, the cause of action is not meritless' and will not be stricken" (*Oasis*, *supra*, 51 Cal.4th at p. 820, original italics)—is broad enough to support the conclusion that a plaintiff may defeat an anti-SLAPP motion merely by showing a probability of prevailing on unprotected activity alleged in the challenged cause of action.  (*Wallace*, *supra*, 196 Cal.App.4th at pp. 1211-1212.)  *Oasis*, however, did not involve a mixed cause of action and therefore did not address whether establishing a probability of prevailing on unprotected activity is sufficient to defeat an anti-SLAPP motion.  We likewise need not address that issue.

20

of the anti-SLAPP statute merely explains why it implicitly rejected the reasoning of *Oasis*. *Cho*, however, never explained why it was not bound by the *Oasis* holding.

Finally, Cahill's reliance on *Wallace* is equally unavailing. *Wallace* advocated allowing a trial court to strike portions of a cause of action based on protected activity when a plaintiff fails to established a probability of prevailing on those portions of the cause of action. *Wallace* interpreted *Taus* as supporting that position and also concluded section 425.16's language and legislative history supported that interpretation. (*Wallace*, *supra*, 196 Cal.App.4th at pp. 1195-1210.) *Wallace*, however, acknowledged *Oasis* reached the contrary conclusion, implicitly overruled *Taus* on this issue, and provided the binding authority it had to follow. (*Wallace*, at pp. 1210-1212.) *Wallace* therefore does not support Cahill's position and section 425.16 did not require the trial court to determine whether Williams established a probability of prevailing on each of the 19 defamatory statements he alleged.[6]

---

[6] In arguing the trial court was required to rule on each defamatory statement, Cahill's counsel failed to cite *Oasis*, *Burrill*, or *Mann* and argued *Wallace* without acknowledging its conclusion that *Oasis* provided the controlling authority. Although an attorney may properly argue for an extension, modification or reversal of existing law or the establishment of new law (see, e.g., § 128.7, subd. (b)(2)), an attorney may not ignore legal authority that is directly adverse to his or her position. California Rules of Professional Conduct, rule 5-200(B) provides, an attorney "[s]hall not seek to mislead the judge, judicial officer, or jury by an artifice or false statement of fact or law." More directly, the American Bar Association's Model Rules of Professional Conduct provide, "A lawyer shall not knowingly: [¶] . . . [¶] fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel . . . ." (ABA Model Rules of Prof. Conduct, rule 3.3(a)(2).) Although California has not adopted the American Bar Association's Model Rules, its courts have cited those rules as persuasive authority and relied upon rule 3.3 in particular to criticize an attorney for failing to cite authority that was indisputably relevant to the issue presented. (*Batt v. City and County of San Francisco* (2007) 155 Cal.App.4th 65, 82-83, fn. 9, disapproved on other grounds in *McWilliams v. City of Long Beach* (2013) 56 Cal.4th 613.) We too find rule 3.3 to be persuasive authority and caution Cahill's counsel against failing to cite authority directly adverse to its position. An attorney may be disciplined for failing to cite known controlling authority if it is shown the attorney intended to mislead the court.

21

2.      The Parties' Partial Settlement Does Not Limit the Scope of Our Review

As a corollary to her contention a court must determine whether a plaintiff established a probability of prevailing on every protected act, Cahill contends the trial court's ruling "cannot stand" because the court denied Cahill's anti-SLAPP motion based solely on Williams's probability of prevailing on the defamatory statements made during the 20/20 episode, and those statements are no longer at issue based on a partial settlement she reached with Williams. According to Cahill, Williams agreed to drop part of his libel cause of action based on those statements, and therefore we may not consider them in reviewing the trial court's ruling. Instead, Cahill contends we must review the trial court's ruling based solely on the statements made in Cahill's online posts, the YouTube video, and her e-mail to a woman Williams was dating. We reject this contention because it is inconsistent with the anti-SLAPP statute's purpose and ignores established principles of appellate practice.

An anti-SLAPP motion must be decided based on the complaint as it existed when the motion was filed. A plaintiff may not avoid an anti-SLAPP motion by either amending the complaint or dismissing the challenged cause of action. (*Wallace*, *supra*, 196 Cal.App.4th at p. 1206; *Salma v. Capon* (2008) 161 Cal.App.4th 1275, 1293-1294; *Sylmar Air Conditioning v. Pueblo Contracting Services, Inc.* (2004) 122 Cal.App.4th 1049, 1054-1056.) Even when a complaint is amended or dismissed as a matter of right (§§ 472, 581, subd. (b)(1)), the trial court still must determine the merits of an anti-SLAPP motion based on the allegations as they existed in the operative complaint when the motion was filed. (*Sylmar Air Conditioning*, at p. 1056; *Pfeiffer Venice Properties v. Bernard* (2002) 101 Cal.App.4th 211, 218-219.)

---

(See *Shaeffer v. State Bar* (1945) 26 Cal.2d 739, 747-748.) Here, Cahill's counsel should have been aware of *Oasis* and the cases following it because they were cited in some of the cases relied on by Cahill's counsel.

The anti-SLAPP statute is designed to provide a mechanism for identifying and expeditiously disposing of meritless litigation filed to punish a party for exercising First Amendment rights. (*Hecimovich*, *supra*, 203 Cal.App.4th at p. 463; *Simmons v. Allstate Ins. Co.* (2001) 92 Cal.App.4th 1068, 1073 (*Simmons*).) Allowing a plaintiff to amend or dismiss a complaint once an anti-SLAPP motion is filed defeats that purpose and allows the plaintiff to achieve the goals of a SLAPP suit—forcing the defendant to expend time and money defending a meritless lawsuit. (*Simmons*, at pp. 1073-1074.)

For similar reasons, the statute's purpose is not served by allowing a defendant to settle the portion of a cause of action on which the trial court found the plaintiff established a probability of prevailing, and then demand an appellate court determine whether the plaintiff established a probability of prevailing on the remaining portions of the cause of action that the trial court was not required to reach. As explained above, a trial court may stop its analysis and deny an anti-SLAPP motion once it determines the plaintiff established a probability of prevailing on at least one protected act because the plaintiff thereby has shown the cause of action is not a meritless claim designed to punish the defendant for exercising First Amendment rights. (*Oasis*, *supra*, 51 Cal.4th at pp. 820-821; *Wallace*, *supra*, 196 Cal.App.4th at p. 1211.)

A plaintiff's decision to settle the portion of a cause of action the trial court found to have merit does not free the appellate court to examine and strike the remaining allegations in the plaintiff's cause of action even if the plaintiff cannot establish a probability of prevailing. The purpose of the anti-SLAPP statute was served once the trial court found any part of the cause of action had merit. (*Oasis*, *supra*, 51 Cal.4th at p. 820.) A later settlement does not change that. Indeed, a defendant may not receive a second chance to strike a cause of action under the anti-SLAPP statute by settling the meritorious portion of the claim, just like a plaintiff may not receive a second chance to disguise a true SLAPP suit by amending the complaint. (See *Simmons*, *supra*, 92 Cal.App.4th at p. 1073.) Accordingly, in analyzing Cahill's anti-SLAPP motion, we

23

are not limited to the alleged defamatory statements made in Cahill's online posts, the YouTube video, and her e-mail.

We find further support for proceeding in this manner in the "'elementary rule of appellate procedure that, when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered. . . .' [Citation.]" (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2.) "Thus, '[m]atters occurring after entry of judgment are ordinarily not reviewable: The appeal reviews the correctness of the judgment or order as of the time of its rendition, leaving later developments to be handled in subsequent litigation.' [Citation.] . . . 'The function of an appellate court is to review the action of the inferior court in rendering the judgment . . . from which the appeal is taken. . . . If the judgment is affirmed such affirmance is as of the date at which it was rendered. If it is reversed the case stands as if no judgment had been rendered by the inferior court. It is therefore manifest that *error on the part of the inferior court cannot be predicated by reason of any matter occurring subsequent to its rendition of the judgment . . . .*' [Citation.]" (*In re Francisco W.* (2006) 139 Cal.App.4th 695, 706, italics added.)

Here, we do not consider the effect of the parties' partial settlement because it occurred after the trial court's anti-SLAPP ruling. When the trial court decided Cahill's anti-SLAPP motion, the allegedly defamatory statements made during the 20/20 episode were part of Williams's libel claim and both sides presented evidence on whether Williams had shown a probability of prevailing. The trial court properly considered the statements when ruling on the motion and, as explained above, was not required to determine whether Williams established a probability of prevailing on the other defamatory statements. Although it is the policy of this state to encourage settlements, a party may not use a partial settlement to remove a valid basis for the trial court's ruling and argue the trial court erred based on circumstances that did not exist when the trial court decided the matter. After we issue the remittitur the parties may

24

effectuate their partial settlement, but that settlement will not affect the scope of our review.

3. Williams Established a Probability of Prevailing Based on the Statements from the 20/20 Episode

a. *Governing Legal Standards and Elements of Libel*

To meet its burden in the second stage of the anti-SLAPP analysis, a plaintiff must establish a probability of prevailing on the challenged cause of action by "'demonstrat[ing] that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.]" (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.) "For purposes of this inquiry, 'the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant [citation]; though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.' [Citation.] In making this assessment it is 'the court's responsibility . . . to accept as true the evidence favorable to the plaintiff. . . .' [Citation.] The plaintiff need only establish that his or her claim has 'minimal merit' [citation] to avoid being stricken as a SLAPP. [Citations.]" (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291, original italics (*Soukup*); *Chaker*, *supra*, 209 Cal.App.4th at p. 1147.)

The sole cause of action at issue here is Williams's libel claim. "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.) To prevail on a libel claim a plaintiff

25

must show (1) the defendant published a statement about the plaintiff; (2) the statement declares or implies a provably false factual assertion; (3) the factual assertion is false; (4) the factual assertion has a natural tendency to injure or cause special damage; and (5) the defendant failed to take reasonable care to determine the truth or falsity of the assertion. (*Hecimovich*, *supra*, 203 Cal.App.4th at p. 470; *Wong*, *supra*, 189 Cal.App.4th at pp. 1369-1370; CACI No. 1704.) If the plaintiff is a public figure, he or she must show the defendant acted with actual malice rather than simply a lack of reasonable care. (*Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 682 (*Stewart*).)

We consider Williams's evidence to determine whether he established a probability of prevailing on each of these elements based on the statements from the 20/20 episode because those are the statements on which the trial court relied and they were the driving force behind this action. Because we conclude Williams established a probability of prevailing based on those statements, we do not address the statements made in the online posts, YouTube video, and e-mail. (*Oasis*, *supra*, 51 Cal.4th at pp. 820-821; *Burrill*, *supra*, 217 Cal.App.4th at pp. 379, 383; *Wallace*, *supra*, 196 Cal.App.4th at p. 1211; *Mann*, *supra*, 120 Cal.App.4th at p. 106.)

b.      *Cahill Made Provably False Factual Assertions About Williams*

""""The sine qua non of recovery for defamation . . . is the existence of falsehood." [Citation.] Because the statement must contain a provable falsehood, courts distinguish between statements of fact and statements of opinion for purposes of defamation liability. Although statements of fact may be actionable as libel, statements of opinion are constitutionally protected. [Citation.]' [Citation.] That does not mean that statements of opinion enjoy blanket protection. [Citation.] On the contrary, where an expression of opinion implies a false assertion of fact, the opinion can constitute actionable defamation. [Citation.] The critical question is not whether a statement is fact or opinion, but '"whether a reasonable fact finder could conclude the published statement

26

declares or implies a provably false assertion of fact."'  [Citation.]"  (*Wong*, *supra*, 189 Cal.App.4th at p. 1370.)

"To determine whether a statement is actionable fact or nonactionable opinion, courts use a totality of the circumstances test of whether the statement in question communicates or implies a provably false statement of fact.  [Citation.]  Under the totality of the circumstances test, '[f]irst, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense. . . .  [¶] Next, the context in which the statement was made must be considered.'  [Citation.]"  (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 113 (*McGarry*).)

The 20/20 episode's introduction poses the question, "Match.com or Match.wrong," and explains the show will "take a look at what happens when crooks come off the streets and through your computer screens, and they can end up taking your love, your money, and even your reputation."  The episode's first two segments explain how con men use photos of other people to set up false profiles on dating Web sites, develop an online relationship with someone looking for love, and convince that person to send them thousands of dollars with the promise they will meet soon.  The segments tell the stories of two women who sent men they never met nearly $25,000 and $100,000, and also the story of a man who committed suicide after learning the woman he loved was a con artist who bilked him out of $50,000.  These segments end by promoting the upcoming segment on Cahill and Williams, explaining it will explore "what happens when the man on the other side of the keyboard moves in and is keeping a dark secret," and will include "questions for the man [Cahill] claims cost her a fortune."

The segment on Cahill and Williams begins, "[Cahill]'s tale is different. She lived the online dating dream, actually meeting face to face and moving in with her Romeo, a fateful decision that she says led her on a road to ruin."  It explains she met Williams through Match.com and he told her "he was a family man with four boys, and like her, was divorced and looking to give love one more try."  Within a few weeks, the

27

segment continues, Cahill was introducing Williams to everyone she knew, including "[s]ome fairly wealthy people," and "[s]lowly but surely, he started moving [in] and staying more and more." The episode states that Cahill "bought [Williams] a $5,000 watch, a whole new wardrobe, and even a Range Rover" because she thought they would marry and she wanted him to look good. The reporter summarizes, "seven months into the relationship, [Cahill] found herself in a new home, blinded by love, [and] oblivious to her mounting debt," but she soon grew concerned because Williams would not introduce her to his four sons. Cahill then explains it was a letter she later received from one of Williams's sons that "opened her eyes" and "told her she was living a lie" because Williams "was still very married, never divorced, [and] never separated." In the months that followed, Cahill claimed she "learn[ed] of not one, but of at least a half dozen other women who claim they fell prey to Williams'[s] lies and infidelity" and she discovered "there's just a multitude of women and that this had been going on for probably, what we can go back is at least eleven, twelve years." The episode also explains Williams's picture and name appears on numerous Web sites warning women not to date him because of the bad experiences other women had with Williams.

A reasonable fact finder could conclude these statements declared or implied at least three provably false factual assertions about Williams, his relationship with Cahill, and his relationships with other women he dated. First, the statements imply that Williams induced Cahill to enter into a romantic relationship by misrepresenting that he was divorced, and that he continued to conceal the truth about his marital status throughout the entire relationship. Indeed, the segment on Cahill and Williams implied that Cahill did not learn Williams was still married until his son sent her a letter stating Williams "was still very married, never divorced, [and] never separated." Whether Williams lied to Cahill about his marital status and when she discovered the truth are facts that may be proved or disproved.

28

Second, the statements as presented in the episode imply that Williams exploited Cahill financially during their relationship and caused her financial ruin. The episode was a nationally broadcast news magazine that focused on con men who use dating Web sites to meet and exploit people financially. It implied Williams was no different than the scam artists portrayed in the episode's first two segments, which described how con men manipulated the emotions of people they met on dating Web sites and scammed them out of thousands of dollars without ever meeting them face to face. The segment on Cahill and Williams suggested that con men also exploit people they meet on dating Web sites by starting personal relationships and living off of the people they meet. During the episode, Cahill expressly states Williams cost her a fortune and led her on the road to ruin. Cahill's statements also implied Williams's romantic deceptions manipulated her to allow him to move into her home and induced her to buy him expensive gifts despite her mounting debt. Whether Williams exploited Cahill financially and caused her financial ruin are facts that may be proved or disproved at trial.

Finally, the statements and the episode's context imply that Williams has a long history of preying on women in the same manner he preyed on Cahill. Once it is established the episode implies Williams exploited Cahill financially, her statements that there are a multitude of other women who "fell prey to Williams'[s] lies and infidelity" implies he also financially exploited these other women. Whether Williams actually did so is a fact that may be proved or disproved at trial.

c.     *Williams Made a Prima Facie Showing Cahill's Statements Were False*

Williams presented a substantial amount of evidence to prove each of the foregoing factual assertions about him was false. Regarding the disclosure of his marital status, Williams presented his own declaration explaining he informed Cahill on their second date that he was separated rather than legally divorced, and he repeated this in several other conversations he had with Cahill during their relationship. Williams also

29

presented declarations from a husband and wife with whom he and Cahill socialized during their relationship. The couple both declared they had numerous conversations with Cahill discussing that Williams was still married. Lastly, Williams presented a declaration from his wife, who declared she had a conversation with Cahill after her relationship with Williams ended and Cahill admitted she knew Williams was not divorced. In ruling on Cahill's anti-SLAPP motion we must accept this evidence as true and therefore conclude Williams met his burden to establish the falsity of this first factual assertion.[7] (See *Soukup*, *supra*, 39 Cal.4th at p. 291.)

Williams also presented sufficient evidence to make a prima facie showing he did not financially exploit Cahill or cause her financial ruin. He presented his own declaration and a copy of a Chapter 7 bankruptcy petition Cahill filed in 2008 to show Cahill lived an extravagant lifestyle beyond her limited income. For example, although Cahill and Williams agreed to share the expenses for the house they purchased in Cahill's name, Williams declared he frequently paid Cahill's half of the mortgage payments and when Cahill did contribute to the mortgage she often used cash advances from her credit cards. Williams also denied Cahill bought him the expensive gifts she claimed in the 20/20 episode. He explained the watch and clothing she purchased for him were worth much less than she claimed and he made all of the payments on the Range Rover even though it was in her name.

---

[7] In the trial court, Cahill asserted 40 objections to Williams's evidence. The court overruled all of Cahill's objections and she forfeited any challenge to those rulings by failing to address them in either her opening or reply brief. (*Salas v. Department of Transportation* (2011) 198 Cal.App.4th 1058, 1074 ["It is appellant's 'burden on appeal to affirmatively challenge the trial court's evidentiary ruling, and demonstrate the court's error"; the failure to do so forfeits any challenge to the trial court's evidentiary rulings].) The only exception is the trial court's rulings on Cahill's authenticity objections to the computer printouts Williams submitted as Cahill's online posts warning women not to date him. We do not decide the propriety of those rulings, however, because the printouts are irrelevant to whether Williams established a probability of prevailing on his libel cause of action based on Cahill's statements in the 20/20 episode.

Williams also submitted a declaration from a certified public account who analyzed the statements from the checking account Cahill and Williams shared and all documents relating to the financing and refinancing of the house the couple purchased. The accountant concluded that Cahill benefitted financially from her relationship with Williams and actually owed him more than $100,000 based on their contributions to the house and their agreement to share any profit. Finally, Williams presented a declaration from his wife describing a conversation she had with Cahill shortly after Cahill and Williams ended their relationship. Virginia declared Cahill admitted she owed Williams $45,000 to $50,000 and that she would rather give that money to Virginia than Williams. Cahill presented her own declaration and other evidence in an effort to rebut Williams's evidentiary showing, but that evidence merely created a triable issue and does not defeat Williams's showing. To overcome Williams's evidence, Cahill had to show Williams's claim failed as a matter of law. (See *Soukup*, *supra*, 39 Cal.4th at p. 291; *Chaker*, *supra*, 209 Cal.App.4th at p. 1147.) Cahill's evidence does not meet that standard.

Finally, Williams made a prima facie showing he did not financially exploit other women he dated. His own declaration denied exploiting other women financially and he submitted a declaration from another woman he dated both before and after he dated Cahill. Although the woman acknowledged Williams initially told her he was divorced, she also denied Williams ever sought to take advantage of her financially and actually turned down the woman's offer to loan him money when he was struggling financially. The woman also declared that Williams helped pay some of her living expenses when she was struggling and he did not ask her to repay him. Cahill presented evidence Williams lied to other women, but she introduced no evidence to show he exploited any of them financially. Consequently, her evidence failed to defeat Williams's claim as a matter of law. (See *Soukup*, *supra*, 39 Cal.4th at p. 291; *Chaker*, *supra*, 209 Cal.App.4th at p. 1147.)

31

d.     *Cahill's Statements Were Libelous Per Se and No Proof of Special Damages Was Required*

"Where a libelous statement 'is defamatory *on its face*, it is said to be libelous per se, and actionable without proof of special damage. . . .' [Citation.]" (*Burrill*, *supra*, 217 Cal.App.4th at p. 382, original italics; Civ. Code, § 45a.) "A statement can also be libelous per se if it contains a charge by implication from the language employed by the speaker and a listener could understand the defamatory meaning without the necessity of knowing extrinsic explanatory matter." (*McGarry*, *supra*, 154 Cal.App.4th at p. 112.) "'[I]f the defamatory character is not apparent on its face and requires an explanation of the surrounding circumstances (the "innuendo") to make its meaning clear, it is not libelous per se, and is not actionable without pleading and proof of special damages.' [Citation.]" (*Burrill*, at p. 382.)

Here, the defamatory statements about Williams during the 20/20 episode are defamatory on their face and therefore no proof of special damages was required to establish a probability of prevailing. As explained above, the express language of the statements and their clear implication accused Williams of lying to Cahill about his marital status to induce her into a romantic relationship, concealing the truth about his marital status throughout the relationship to exploit her financially, and exploiting several other women in a similar manner over at least a decade. No explanation about the surrounding circumstances was required to make the defamatory meaning of those statements clear.

e.     *Cahill Failed to Exercise Reasonable Care in Determining the Truth or Falsity of the Statements*

Liability for defamation cannot be imposed on a defendant without fault. (*Carney v. Santa Cruz Women Against Rape* (1990) 221 Cal.App.3d 1009, 1015.) When the plaintiff is a private person, he or she must establish the defendant acted with a lack of reasonable care in determining the truth or falsity of the statement. (*Hecimovich*,

32

*supra*, 203 Cal.App.4th at p. 470; CACI No. 1704.) When the plaintiff is a public figure, the plaintiff must show the defendant acted with actual malice, which requires evidence the defendant published the defamatory statement with knowledge of its falsity or with reckless disregard for its truth. (*Stewart*, *supra*, 181 Cal.App.4th at p. 682.)

"The courts have 'defined two classes of public figures. The first is the "all purpose" public figure who has "achiev[ed] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." The second category is that of the "limited purpose" or "vortex" public figure, an individual who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." [Citation.] . . .' [Citation.]" (*McGarry*, *supra*, 154 Cal.App.4th at p. 113.)

Three elements are required to classify a person as a limited purpose public figure: "First, there must be a public controversy, which means the issue was debated publicly and had foreseeable and substantial ramifications for nonparticipants. Second, the plaintiff must have undertaken some voluntary act through which he or she sought to influence resolution of the public issue. In this regard it is sufficient that the plaintiff attempts to thrust him or herself into the public eye. And finally, the alleged defamation must be germane to the plaintiff's participation in the controversy." (*Ampex Corp. v. Cargle* (2005) 128 Cal.App.4th 1569, 1577.)

Williams lacks the pervasive fame or notoriety required to be an all purpose public figure. Similarly, he is not a limited purpose public figure because he has not voluntarily done anything to influence the resolution of a public issue. As discussed above, the danger of online dating is a public issue, but Williams has done nothing to influence the outcome of that issue. Indeed, he refused to participate in the 20/20 episode and asked that he not be included in it. Moreover, his use of various dating Web sites and even creating a false profile are not attempts to resolve that issue.

33

Accordingly, Williams need only show Cahill failed to exercise reasonable care in determining the truth or falsity of the statements made during the 20/20 episode. Cahill's lack of reasonable care is apparent from the face of the statements. When we accept as true Williams's evidence that he and others told Cahill he was not divorced, the conclusion Cahill failed to exercise reasonable care in determining the truth of her claim she did not know he was still married is inescapable. (See *Soukup*, *supra*, 39 Cal.4th at p. 291 [when ruling on an anti-SLAPP motion, the trial court must accept as true all evidence favorable to the plaintiff and may not weigh conflicting evidence or resolve credibility issues].) Similarly, when we credit Williams's evidence showing he did not financially exploit Cahill or any other women he dated, Cahill's lack of reasonable care in accusing Williams of doing so also is unavoidable. (*Ibid.*)

III

DISPOSITION

The order is affirmed. Williams shall recover his costs on appeal.


ARONSON, J.

WE CONCUR:


O'LEARY, P. J.


THOMPSON, J.

34